## DIXON et al. v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. July 23, 1925.)

Nos. 6797, 6798.

**1. Criminal law ⚖=165—Confinement in a penitentiary while awaiting trial does not constitute former jeopardy.**

The fact that defendants, charged with crime, were confined in a state penitentiary for safe-keeping while awaiting trial, does not constitute a former jeopardy which invalidates their subsequent trial and sentence to the penitentiary after conviction.

**2. Criminal law ⚖=339—Testimony in identification of a defendant held admissible.**

Admission of testimony of a witness in identification of a defendant *held* not error, though it was not sufficiently definite in itself

for identification, where it was supplemented by other testimony which was sufficient.

**3. Criminal law ⚖=365(1)—Evidence, competent as part of res gestæ, not inadmissible because tending to prove another offense.**

In a trial for assaulting the persons in charge of a mail car and robbing them of mail, testimony that defendants also robbed members of the train crew of their personal property was not inadmissible because such act constituted a crime under the law of the state, but was competent as part of the res gestæ.

**4. Post office ⚖=49—Testimony to finding of articles near place of mail robbery held competent.**

Testimony of the finding, near the place of a mail robbery, of articles shown by other testimony to be similar to articles in possession of defendants the day before, *held* competent.

**5. Arrest ⚖=71—Taking of stolen property from pocket of defendant after arrest held not unlawful seizure.**

The taking of government bonds from the coat pocket of a defendant after his arrest for mail robbery, later identified as part of the stolen mail matter, *held* not an unlawful search and seizure.

**6. Criminal law ⚖=438—Photograph of deceased mail robber held admissible on trial of alleged confederates.**

On trial of defendants, charged with mail robbery, the photograph of a man killed by the marshal in attempting his arrest for the robbery, before indictment of defendants, and who was identified as one of the robbers, and shown by other testimony to have been the leader, and who, when killed, had in his possession a part of the stolen property, *held* admissible in evidence.

**7. Criminal law ⚖=423(8)—Conversation between defendants prior to mail robbery held competent.**

Testimony to a conversation between defendants charged with mail robbery and another, which led to the agreement and plan to commit such robbery, instead of another in contemplation, *held* competent.

**8. Criminal law ⚖=901—Demurrer to evidence waived by subsequent introduction of evidence.**

A demurrer to the evidence at the close of the government's case is waived by the subsequent introduction of evidence by defendants, without a later motion for instructed verdict.

In Error to the District Court of the United States for the Western District of Oklahoma.

Criminal prosecution by the United States against Riley Dixon and others. Judgment of conviction, and defendants bring error. Affirmed.

Frans E. Lindquist, of Kansas City, Mo., for plaintiffs in error.

W. A. Maurer, U. S. Atty., and James A. Ingraham, Asst. U. S. Atty., both of Oklahoma City, Okl.

Before SANBORN and KENYON, Circuit Judges, and SCOTT, District Judge.

KENYON, Circuit Judge. Riley Dixon, George Curtis, Grover C. Durrill, Curtis Kelley, Earl Thayer, Frank Nash, Isaac Ogg, and Goldie Bates were, on the 23d day of February, 1924, indicted by a grand jury in the United States District Court for the Western District of Oklahoma for violation of section 197 of the Penal Code (Comp. St. § 10367).

The indictment contains two counts—the first charging that on or about August 20, 1923, near Okesa, in Osage county, Okl., the defendants, with dangerous weapons, assaulted certain postal clerks having the lawful custody of the United States mail, in a post office car on a Missouri, Kansas & Texas Railroad passenger train, and by putting them in fear did rob, steal and purloin from such mail certain registered letters containing valuable matter. The second count charges at the same time and place, by force of arms and putting the postal clerks in fear, defendants did steal and purloin certain registered mail from them while they were in charge of the post office car before mentioned, and that, in effecting and attempting to effect the robbery, assaulted the postal clerks with dangerous weapons, and put their lives in jeopardy. Conviction under the first count would carry a penalty of not more than 10 years in prison, while, under the second, imprisonment is for 25 years.

Upon arraignment, Dixon, Curtis, Durrill, Thayer, Nash, and Goldie Bates each entered a plea of not guilty. February 27, 1924, defendant Isaac Ogg entered a plea of guilty, and on the next day defendant Curtis Kelley entered a plea of guilty. At the conclusion of all the evidence on the part of the government the case was dismissed as to Goldie Bates upon motion of the United States district attorney. The jury returned a verdict of guilty on both counts of the indictment against plaintiffs in error (who will hereafter be designated defendants). Each of said defendants was sentenced to imprisonment in the United States Penitentiary at Leavenworth, Kan., for a term of 25 years.

The indictment arose out of the holdup of a passenger train on the Missouri, Kansas & Texas Railroad, carrying United States mail, near the town of Okesa, Osage county, Okl., about 12:30 a. m. August 21, 1923.

After the train left Okesa, which was not a regular stop, but where the train did stop that night, two of the bandits covered the engineer and fireman with guns and compelled the stopping of the train at a point where their coconspirators had built a fire in the middle of the track as a signal to stop. The leader of this expedition was one Al Spencer who was not indicted, because, in the attempt to arrest him he was killed by the officers. Approximately $21,000 worth of bonds were forcibly secured from the mail car; the postal clerks being held up at the point of guns. The train crew were robbed of their personal belongings; the fireman was assaulted, being knocked unconscious by a blow on the head from the gun of one of the bandits. He was also kicked in the ribs by some of them. Defendant Ogg made a confession to the officers, telling how the robbery was planned. He lived on a farm about 10 miles from Okesa, which seems to have been at times the meeting place for Spencer and others concerned in the robbery. Certain property of the defendants was found near the scene of the holdup of the train which was produced in evidence. When defendant Durrill was arrested by the United States Marshal, four of the stolen bonds were found in his coat pocket. Ten of them were found on the person of Spencer after he was killed. The bonds were definitely identified by the serial numbers.

Thirteen assignments of error are argued by counsel for defendants. We consider them in the order of argument.

[1] First. In view of the fact that defendants were confined in the state penitentiary at McAlester, Okl., by the United States Marshal for the Western District of Oklahoma prior to trial, and that they have, upon conviction, been sentenced to serve 25 years in the United States Penitentiary at Leavenworth, it is urged that they have been twice put in jeopardy of life and limb, contrary to and in violation of the Fifth Amendment to the Constitution of the United States. The confinement at the McAlester Penitentiary prior to trial seems to have been for the purpose of safe-keeping. If there was no authority to keep them there, they could have been released on habeas corpus. Their confinement was no part of their sentence. This question was not urged in the trial court. It is difficult to believe it is seriously urged here. If mere confinement of prisoners in a jail or penitentiary for safe-keeping while awaiting trial constitutes former jeopardy, few criminals would be required to serve a penitentiary sentence.

[2] Second. Objection is made to the testimony of W. O. Miller as to his identification of defendant Dixon. The proceeding with relation thereto is as follows:

"Q. (By Mr. Maurer): Have you seen this defendant over here, Mr. Dixon, before? A. Yes, sir; I saw him before.

"Q. When did you see him? A. I saw him in Parsons when they brought him through there.

"Q. How does he compare with either of the men that came over the engine with the gun and held you up?

"Mr. Patterson: Objected to as incompetent, irrelevant, and immaterial.

"By the Court: Overruled.

"Mr. Patterson: Exception.

"Q. Answer the question. A. As far as size is concerned, he is about the same size."

Of course, as argued in the brief of counsel for defendants, the fact that a person was about the same size as some bandit would not justify the conviction of such person of having committed the crime charged in the indictment. If this were the only testimony identifying Dixon as connected with the holdup of this train, counsel might well argue that it was insufficient, but there is a great deal of other evidence in the case connecting Dixon therewith, including his own statement to witnesses that he took part in the robbery. The testimony of Miller, objected to, is merely one element in the identification. The weight and effect of it is for the jury. The objection to the testimony is groundless.

Third. Error is predicated on permitting witness Miller to identify a picture of Al Spencer. The futility of this objection is shown by the record. This question was asked the witness:

"Q. Look at that picture (showing witness a photograph). Do you recognize that man? A. Yes, sir.

"Q. Who is he? * * * A. I don't know except what they told me."

No further answer was made to this question. The witness later testified without objection that the picture was one of the men who held up the train. There is nothing to this assignment.

[3] Fourth. The next complaint is that there was error in permitting the same witness to testify that the bandits robbed the train crew of their personal belongings, because this was an offense against the laws of the state of Oklahoma, and not an offense against the law of the United States, that this evidence was prejudicial to the rights of defendants, and notwithstanding the fact that no objection was made to such evidence, it is urged this court should look into the matter as constituting such a palpable error as to amount to a miscarriage of justice. Under this rather novel theory, if the bandits had killed the express messenger or murdered the whole train crew, the evidence thereof could not have been introduced, because such actions were crimes under the Oklahoma law. Such theory would throw a safeguard around the gentlemen engaged in the pastime of holding up mail trains, which would make such calling safer than at present. The testimony of Miller as to the robbing of the train crew was a part of the res gestæ. The facts of a crime of this nature may show the violation of many of the laws of Oklahoma. It does not seem possible that any one can seriously claim that therefore the federal government is barred from prosecuting a violation of its statutes.

Fifth. This is to the same effect as the preceding one. It seems that the fireman on the train was assaulted by one of the bandits. Counsel claims that this assault was not a violation of section 197 of the Penal Code of the United States, that it was an offense against the laws of the state of Oklahoma, and that the United States District Court has no jurisdiction thereof. Counsel seems to confuse the crime charged and the elements thereof with distinct offenses under the laws of the state. There was no error in admitting the evidence of the assault on the fireman by one of the train robbers. It was clearly part of the res gestæ.

[4] Sixth. Defendants complain of the ruling of the court in permitting witness J. K. Ellis to testify, over objection, to the finding of a blue handkerchief, a mask, a piece of a stocking, and rubber finger stalls. The testimony was that these were found near the scene of the robbery. Isaac Ogg, one of those originally indicted, and who pleaded guilty, testified that on the day before the robbery he had purchased rubber finger stalls for use by the defendants in this very robbery. He further testified that defendant Thayer had a number of pairs of ladies' hose in his pocket which resembled the hose found at the scene of the robbery. It does not appear exactly what these hose were to be used for, but the inference from the evidence is that they were for the purpose of making masks. It was specially urged, as to the part of the stocking introduced, that it was found under a bridge and not in the immediate vicinity of the holdup, but the testimony shows that this bridge was only a few feet from the head of the train. Clearly this evidence was admissible.

[5] Seventh. Error is claimed in permitting witness J. K. Ellis to testify, over objection, as to the finding of four government bonds in the sum of $1,000 each, wrapped up in a piece of newspaper and taken from the coat pocket of defendant Durrill. The testimony shows that certain government bonds had been committed to the United States mails the night of the robbery. Their numbers appear in evidence, and there is no question as to identification. These four bonds, taken from Durrill's coat, were identified by number as being part of those taken from the particular train robbed. There is no question that some $21,000 in bonds was secured by the robbers; the serial numbers were checked with the bonds taken from Durrill. Something is said in argument as to invading the home of Durrill. Whether or not this question is important, we may say there is nothing in the record to show that the place where Durrill was arrested was his home. It seems to have been some kind of shack in a different place from that of his home. In any event the United States Marshal, McDonald, had a warrant for his arrest, and had placed him under arrest at the time these bonds were taken from his coat pocket. These bonds were a part of the loot, and were taken from Durrill or from his coat pocket at the time he was arrested. These facts do not warrant any claim of unlawful search and seizure. Garske v. United States (C. C. A.) 1 F.(2d.) 620; United States v. Welsh (D. C.) 247 F. 239; Casey v. United States (C. C. A.) 281 F. 897; Green et al. v. United States (C. C. A.) 289 F. 236; Agnello et al. v. United States (C. C. A.) 290 F. 671; Browne v. United States (C. C. A.) 290 F. 870; United States v. Stafford et al. (D. C.) 296 F. 702; Weeks v. United States, 232 U. S. 383, 34 S. Ct. 341, 58 L. Ed. 652, L. R. A. 1915B, 834, Ann. Cas. 1915C, 1177. It may be noted that some of the bonds taken in the robbery were found on the body of Al Spencer after he was shot—substantially ten $1,000 bonds. The testimony shows that Spencer was to sell these bonds and divide the loot among the others; he being the gentleman apparently in whom the defendants had confidence. He was prevented from carrying out his plans because of his death, brought about at the time of his attempted arrest, which was before the indictment in this case was returned by the grand jury.

[6] Eighth. The question is raised as to admitting in evidence the photograph of Al Spencer, deceased. Counsel for defendants portray a pen picture of Spencer in the brief as follows: "Al Spencer, one of the most notorious bandits, with about the same reputation in Oklahoma as Jesse James had in Missouri, was killed by Alva McDonald, United States Marshal, and his posse, along the line of Kansas and Oklahoma, on September 15, 1923, at 7:30 in the evening. The Okesa mail robbery took place on the 21st of August, 1923, and the indictment was not returned until the 23d day of February, 1924."

The record is full of testimony as to Spencer's connection with the crime. He seems to have been the leader of the crowd. Meetings were held at his camp the night before the robbery, where, around a gallon of whisky, Spencer and the defendants, according to Isaac Ogg's testimony, presumably were planning the robbery. The attempt of the defense in the trial of the case was to show that Spencer robbed the train with the assistance of some mysterious and unknown men, not the defendants. Witness Miller had identified the picture as that of one of the men who helped to hold up the train. Isaac Ogg and his son, Alberta Ogg, identified the picture as that of Spencer. We are unable to see any error in the admission of the picture. The fact that it was one of Spencer after death is immaterial. This covers also the tenth assignment argued by counsel for defendants.

Ninth. It is urged that the District Court erred in permitting Alberta Ogg to testify as to Al Spencer's taking Goldie Bates from the residence of Isaac Ogg, his father. The witness testifies he saw Al Spencer come and get her once and take her away. We do not see how the rights of these defendants could in any way be prejudiced by the fact that the record shows Al Spencer at one time might have associated with Goldie Bates. The objection is trivial.

Tenth. This is covered by our discussion of the eighth assignment of error.

[7] Eleventh. This goes to the question of alleged error in the court permitting Isaac Ogg to testify, as defendant's counsel contends "to another attempted robbery." The evidence shows that Al Spencer was the leader in arranging the train robbery. Witness Isaac Ogg told facts relating to their meetings and what was said. It is true he was one of the conspirators, and the court carefully charged the jury as to this, but there is evidence in the record to thoroughly corroborate his testimony. The conversation especially objected to is one in which defendant Thayer is alleged by Ogg to have said

to Al Spencer, in Ogg's presence and in the presence of the other defendants, that they would not pull that job over there, referring to a contemplated job over at Westville, but would pull the one down below, referring to the train robbery for which the indictment was returned; that Thayer said to Spencer, "If we pull that job over yonder I will be arrested," and, "If we pull this one down here about Okesa, that bunch running around Okesa will be arrested." These conversations between Thayer and Spencer, in the presence of the witness, and in the presence of others of the defendants, were leading up to the very train robbery for which indictments were returned. Both of these men were connected with the plan and conspiracy to rob the mail train. Instead of showing other crimes, the conversations show an absence thereof, and a concentration on this one. The defendants with Spencer were trying to decide which would be the better job to undertake—to rob a train at Westville or a train at Okesa. We see no reason why this evidence was not entirely competent.

Twelfth. In the examination of Isaac Ogg, who admitted that he had pleaded guilty, but denied that he had been promised immunity, this question was asked: "Q. You are just as positive about that as you are that no immunity has ever been promised to you?" An objection thereto was sustained. This called for a mere mental condition of the witness and was argumentative. Further, there was no exception taken to the action of the court.

[8] Thirteenth. It is claimed the court erred in overruling the demurrer of defendants at the close of the government's case. Objection is made in the demurrer that the indictment alleges the offense was committed on or about the 20th day of August, while the record shows it was committed on the 21st day of August, and that hence there is a fatal variance and that the government has failed to prove that any crime was committed by any one on the 20th day of August, 1923, in the Western district of the state of Oklahoma. The evidence shows the offense was committed on August 21st. The variance was of course immaterial. The demurrer also questions the sufficiency of the testimony to warrant the case going to the jury. This question was waived by the defendants proceeding to introduce evidence. Steffen v. United States (C. C. A.) 293 F. 30; Short v. United States, 221 F. 248, 137 C. C. A. 104; Collins v. United States, 219 F. 670, 135 C. C. A. 342. No motion was made at the close of all the evidence to in-struct a verdict on the ground that the evidence was not sufficient to show guilt. We have examined the evidence in this record very carefully. It is amply sufficient, in our judgment, to justify a verdict of guilty. It would be difficult to see how a jury could arrive at any other conclusion.

Counsel for defendants urge that, notwithstanding the fact that many of the matters now urged were not properly preserved for review by the appellate court, the amendment to section 269 of the Judicial Code (Comp. Stat. Ann. Supp. 1919, § 1246) should afford defendants relief. The purpose of this amendment was to prevent a reversal for mere technical errors not affecting substantial rights. That section could well be appealed to by the government to affirm this case. Most of the assignments of error are without substance or merit. Nevertheless we have given them consideration. Were there any errors in the case, they were slight. The evidence abundantly sustains the verdict.

The judgment is affirmed.