Richard Lee GOLLIHER, Appellant,

v.

UNITED STATES of America,
Appellee.

Harry Richard HOLMES, Appellant,

v.

UNITED STATES of America,
Appellee.

Carl Dean WHEELER, Appellant,

v.

UNITED STATES of America,
Appellee.

Nos. 18069, 18073, 18121.

United States Court of Appeals
Eighth Circuit.

June 30, 1966.

Richard J. Bruckner, of Schrempp, Lathrop, Rosenthal & Bruckner, Omaha, Neb., for appellants Richard Lee Golliher and Carl Dean Wheeler; David S. Lathrop, of Schrempp Lathrop, Rosenthal & Bruckner, Omaha, Neb., on the brief.

Alfred A. Fiedler, Omaha, Neb., for appellant Harry Richard Holmes.

Russell J. Blumenthal, Asst. U. S. Atty., Omaha, Neb., for appellee; Theodore L. Richling, U. S. Atty., Omaha, Neb., on the brief.

Before MATTHES and GIBSON, Circuit Judges, and HUNTER, District Judge.

GIBSON, Circuit Judge.

This is an appeal from the United States District Court for the District of Nebraska wherein appellants Golliher, Wheeler, and Holmes were convicted of unlawfully entering a Federally insured bank in violation of 18 U.S.C. § 2113 (a).[1]

A little after midnight on the morning of April 28, 1963, Marshal Padgett of the small town of Wallace, Nebraska, was parked in his car across the street from the Farmers State Bank of Wallace. With him were two teen-age youths, Gary Gier and Rodney Ridenour. First, they observed a red and white Pontiac drive by them. A few minutes later they observed two men at the front door of the bank. A little later they noticed two men on the roof of the bank. All three of the individuals in the Marshal's car observed the two men through high power binoculars belonging to the Marshal. Upon hearing the sound of splintering wood, they drove to the back of the bank, but the men they observed had disappeared.

Two hours later, at about 2:00 a.m., Deputy Sheriff Kasha received a call from County Sheriff Gilster describing the vehicle seen by Marshal Padgett at the scene of the crime. At about 3:00 a.m. Deputy Kasha observed a red and white 1956 Pontiac coming from the direction of Wallace. He stopped the car and arrested appellant Holmes for investigation of the bank burglary.

Shortly after noon the same day, Sunday, April 28, about twelve hours after the crime, Marshal Padgett received a

---

[1]. 18 U.S.C. § 2113(a) in its pertinent part to this case reads as follows:

\* \* \*

"Whoever enters or attempts to enter any bank, \* \* \* with intent to commit in such bank, \* \* \* any felony affecting such bank \* \* \* and in violation of any statute of the United States or any larceny—

"Shall be fined not more than $5,000 or imprisoned not more than twenty years, or both."

call indicating that two men were walking along the railroad tracks away from Wallace. F.B.I. Agents Green, Ryan, and Marshal Padgett went to where the men had been spotted. Upon identification by Marshal Padgett, Agent Green arrested appellants Golliher and Wheeler. The three appellants were taken before a United States Commissioner the next afternoon, Monday, April 29, 1963, in the neighboring town of North Platte, Nebraska.

Appellants were brought to trial before a jury in September 1964. However, a mistrial was declared. In April 1965 appellants were again brought to trial. They were found guilty by the jury and sentenced by the Court. Appellants have lodged a large number of complaints: (1) They allege that their arrests were illegal; (2) After their arrests they state that they were illegally questioned; (3) During their detention, they argue, their clothing was unconstitutionally seized; (4) The method of their being viewed by government witnesses is challenged; (5) Under the circumstances of this trial, appellants allege that it was error not to grant them separate trials; (6) The right of confrontation, appellants contend, was denied to them, and (7) Finally, they argue, that the trial court erred in not instructing on police officer bias and erroneously instructing on the flight of the accuseds.

I. As one can see from the outline of appellants' numerous complaints, they are alleging various illegal police activities taking place after their arrest, such as the method of interrogation, the seizure of their clothing, and the view by government witnesses. As a basis for each of these arguments, appellants vaguely contend that they were illegally arrested. They do not contend that there was a lack of probable cause for their arrests. Rather, they make some broad complaints about not being informed of their rights against self-incrimination and not being provided with counsel. Appellants' argument is without legal foundation.

It is only when incriminating admissions are made during an interrogation that the question arises as to whether an accused has been warned of his rights and been denied the opportunity to consult with his attorney. See, Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). Whether or not an accused was so warned at the instant of his arrest has no effect upon the validity of the arrest. Even were we to accept appellants' testimony that they were not properly informed, which proposition was in dispute, the law does not now, nor has it ever, required as a prerequisite for a valid arrest that the arresting officer inform the arrested person of his numerous Constitutional protections. To so require would place an unwarranted and unrealistic burden on the average law enforcement officer and provide the accused with no substantial protection that he now does not have under the law.

Although appellants have made no issue of this point, we have examined the record and have concluded that there was probable cause for the arrest of all three of the appellants. Therefore, we must conclude that the arrests in question were valid.

II. On much the same testimony appellants contend that their interrogation was illegal under the doctrine of Escobedo v. State of Illinois, supra. *Escobedo* held that statements elicited by the police during an interrogation may not be used against an accused at a criminal trial where the investigation is no longer a general investigation into an unsolved crime, where the suspect has requested and been denied an opportunity to consult with his lawyer and where the police have not effectively warned him of his right to remain silent.

As applied to two of the appellants, Golliher and Wheeler, perhaps the prime distinguishing factor is that unlike *Escobedo,* they made no admission or confession which was admitted as evidence in their trial. The question-

ing of these appellants only elicited statements of their innocence. Mere complaints about a violation of an accused's Constitutional rights will not warrant a blanket reversal of his conviction. These appellants must affirmatively point to some prejudicial evidence that was elicited by the alleged illegal questioning. This they failed to do.

Furthermore, there is very strong evidence indicating that these appellants were not the victim of abuses specifically condemned in the *Escobedo* opinion. There is substantial evidence from which the trial court could conclude that appellants, Golliher and Wheeler, from the time of their arrest, throughout their detention were adequately informed of their rights. F.B.I. Agent Green testified that at the time of their arrest he advised Golliher and Wheeler of their right to remain silent, to consult an attorney, and that any statements they made might be used against them. F.B.I. Agent Ryan testified that he was present at the time of the arrest of Golliher and Wheeler and that he heard Agent Green so inform the two appellants, both at the time of their arrest and later while they were being taken to the town of North Platte. The testimony further indicates that subsequent to their arrest they were not questioned by the F.B.I. until after they were brought before the United States Commissioner the following afternoon.

In their hearing before the Commissioner they were again informed of their various rights. Following the hearing, both of these appellants were questioned by Agent Anderson. Agent Anderson testifed that he again informed Golliher and Wheeler of their right to consult an attorney, their right to remain silent, and of the possibility of introducing against them any statements they made. Both of these appellants protested their innocence, with Wheeler even commenting "that he didn't need an attorney, that he hadn't done anything wrong."

There is additional evidence which indicates that Golliher and Wheeler did not request an attorney or the use of the telephone. There is nothing to indicate that the questioning was in any way unreasonable. Certainly, appellants Golliher and Wheeler have demonstrated no basis upon which this Court should reverse their convictions under the dictates of *Escobedo*.

Unlike Golliher and Wheeler, it is true that appellant Holmes made two damaging admissions to F.B.I. agents that were admitted against him. However, we do not believe that *Escobedo* demands a reversal of his conviction, as the statements were voluntarily made under conditions not proscribed by *Escobedo*.

Prior to making these admissions, Holmes was fully informed of his rights and the consequences of his admissions. Upon his arrest Holmes was generally informed of his Constitutional rights by Deputy Sheriff Kasha. At his appearance before the Commissioner, appellant Holmes was clearly informed of his rights and provided with an opportunity to contact friends or an attorney.

The first admission of Holmes came shortly after the hearing before the Commissioner and was made to Agent Anderson. Agent Anderson testified that in addition to the warning given by the Commissioner he again informed Holmes of his right to remain silent, that statements made by him would be admissible against him, and his right to counsel. After only fifteen minutes of questioning, Holmes orally admitted the commission of the crime in concert with the other appellants. He thereafter indicated his desire to remain silent. He was pressed no further, and the interview was promptly terminated. A written statement was never obtained. There is ample evidence to support the finding that Holmes never requested an attorney, and there is no evidence that an attorney was prohibited from conferring with him. All of the evidence clearly indicates that this admission was voluntarily made.

The second admission came some two months later while Holmes was free on bond. The questioning took place on the street in front of Holmes' place of employment. The questioning concerned a

general investigation of an unrelated matter. Even so Agent Wessel stated that prior to questioning Holmes he again informed Holmes of his right to remain silent and his right to counsel. Holmes specifically stated that he did not need the advice of his retained counsel to talk with Wessel. During the course of the conversation Holmes again freely admitted commission of the crime in question.

We do not believe the questioning of appellant Holmes violated his right to counsel and the privilege against self-incrimination as set out in *Escobedo*. Appellant was fully informed of his rights. He was not deprived of counsel, and in all other ways was properly questioned. The confessions give every indication of being absolutely voluntary and completely reliable.

Since Escobedo v. State of Illinois was decided on June 22, 1964 and the trial of this case commenced on April 19, 1965 we are bound to apply, and have applied, the dictates of *Escobedo* to the facts in this case. On June 13, 1966 the Supreme Court established additional guidelines to be followed in the questioning of accuseds. Miranda v. Arizona, 86 S.Ct 1602. However, the Supreme Court specifically held that these additional guidelines were to have prospective application only. Johnson v. New Jersey, 86 S.Ct. 1772 (June 20, 1966). Therefore, it is not incumbent upon us to decide whether the questioning of appellants was in strict accordance with the stringent rules set out in Miranda. Appellants were properly questioned under the guidelines of the then controlling Escobedo v. State of Illinois. The admissions of Holmes were voluntary and properly elicited, and were, therefore, correctly received by the trial court.

Though not specifically argued by appellants, we note that they were arrested on Sunday and taken to the County jail in the neighboring town of North Platte, Nebraska. They were taken before the United States Commissioner the afternoon of the next day. Under the circumstances of a rural Nebraska community and the Sunday arrest, we do not believe that a delay until Monday was "unnecessary." Therefore, appellants' detention under the doctrine of Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), and McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), was legal and proper. In all ways appellants were legally arrested and properly detained.

III. Subsequent to appellants' arrest, they were relieved of their clothing. The clothing was subjected to scientific tests which disclosed microscopic particles matching particles taken from a bag discovered by officers at the scene of the offense. This evidence was admitted at the trial over the general objection that it violated appellants' Constitutional rights.

We, of course, recognize that general exploratory searches are to be condemned. Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921); United States v. Lefkowitz, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877 (1932). Furthermore, the law clearly recognizes the distinction between evidentiary materials which may not generally be seized, either under the authority of a search warrant or incident to a lawful arrest, and objects which may validly be seized under all circumstances, such as instrumentalities used in the commission of the crime, fruits of the crime, modes of escape from custody and contraband material. Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947). Appellants, no doubt, are contending that their clothing does not fall under one of the classifications in which seizure is permitted. Rather, they hint, that their clothing is purely evidentiary in character and, therefore, inadmissible under the doctrine of Gouled v. United States, supra. We cannot accept this position.

A reading of the above cases indicates to our satisfaction that the Supreme Court is merely condemning the general exploratory search of a dwelling for the sole purpose of uncovering evidence. At

no time has the Supreme Court ruled that search for and seizure of evidence directly under the control of a validly arrested person is unconstitutional. In fact, in rather significant dictum, the Supreme Court in Weeks v. United States, 232 U. S. 383, 392, 34 S.Ct. 341, 58 L.Ed. 652 (1914) held that the government had the right "to search the person of the accused when legally arrested to discover and seize the fruits or evidences of crime." This statement has been widely accepted as an "exception" to the general rule which prohibits searches for evidence, and is thought to allow the seizure of evidentiary materials from validly arrested individuals. Carroll v. United States, 267 U.S. 132, 138, 45 S.Ct. 280, 69 L.Ed. 543 (1925); Honig v. United States, 208 F.2d 916 (8 Cir. 1953); Morrison v. United States, 104 U.S.App.D.C. 352, 262 F.2d 449, 451 n. 6 (1958); United States v. Kirschenblatt, 16 F.2d 202, 203 (2 Cir. 1926); Landau v. United States Attorney for Southern District of New York, 82 F.2d 285, 287 (2 Cir. 1936); Shettel v. United States, 72 App. D.C. 250, 113 F.2d 34 (1940); Morton v. United States, 79 U.S.App.D.C. 329, 147 F.2d 28 (1945) cert. denied 324 U.S. 875, 65 S.Ct. 1015, 89 L.Ed. 1428; Cavness v. United States, 187 F.2d 719 (9 Cir. 1951) cert. denied 341 U.S. 951, 71 S.Ct. 1019, 95 L.Ed. 1374; McIntire v. United States, 217 F.2d 663 (10 Cir. 1954) cert. denied 348 U.S. 953, 75 S.Ct. 442, 99 L.Ed. 745.

The Supreme Court itself had indicated that it did not expect the "seizure of evidence" prohibition to have universal application. Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927), specifically allowed the seizure of evidence of a crime other than for which the accused was validly arrested and searched. Later the Court in United States v. Lefkowitz, 285 U.S. 452, 456, 52 S.Ct. 420, 76 L.Ed. 877 (1932), clearly distinguishes the general exploratory search made of an accused's premises in order to find evidence, as condemned by Gouled, from the admittedly lawful search incident to a valid arrest found in the *Marron* case.

There is a very narrow and hazy line between the instrumentalities used in the commission of a crime and pure evidence. It is in this undefined and hazy area that many courts have been able to find refuge when presented with a problem of seizing evidence. Courts have attached the label of "instrumentality" to pieces of evidence, and at least brought their case within the fold of permissive searches broadly defined in Harris v. United States, supra. See, United States v. Guido, 251 F.2d 1, 3 (7 Cir. 1958) cert. denied 356 U.S. 950, 78 S.Ct. 915, 2 L.Ed.2d 843; State v. Chinn, 231 Or. 259, 373 P.2d 392 (1962). Obviously, the continued stretching of the individual circumstances in order that they might be literally acceptable under the "black letter" statements of law could easily reach the level of the absurd. State v. Bisaccia, 45 N.J. 504, 213 A.2d 185 (1965). Certain state courts have recognized this possible absurdity and bravely announced that searches for evidence are proper regardless of where they took place as long as they were otherwise reasonable. State v. Bisaccia, supra; Boles v. Commonwealth, 304 Ky. 216, 200 S.W.2d 467 (1947); State v. Raymond, 142 N.W.2d 444 (Iowa May 3, 1966). Though such a permissive rule might be strongly recommended, under the present Supreme Court dictates we do not feel that we could at this time validly sanction all searches and seizures of evidence that are otherwise reasonable and proper. However, we do not feel that we have been foreclosed from holding that evidence directly and intimately connected with the crime for which an accused is arrested and is actually on the person of the accused at the time of his arrest is subject to search and seizure incident to his lawful arrest. Nothing but increased confusion would be gained by attempting to indulge in a fiction that a man's shirt is an instrumentality used in the commission of a night time burglary, and we shall not attempt to do so here.

The Fourth Amendment does not clearly delineate between searches that are legal and those that are illegal. It only prohibits the unreasonable with each particular case being decided on its own facts and circumstances. Ker v. State of California, 374 U.S. 23, 33, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); Rios v. United States, 364 U.S. 253, 255, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960); Frank v. State of Maryland, 359 U.S. 360, 79 S.Ct. 804, 3 L.Ed.2d 877 (1959). Applying this doctrine to an accused we can see nothing unreasonable about seizing from a validly arrested person, evidence that is intimately connected with the crime for which he is arrested. United States ex rel. Boucher v. Reincke, 341 F.2d 977 (2 Cir. 1965); United States v. Pisano, 193 F.2d 361 (7 Cir. 1951). In such a situation the accused is already subject to a general search incident to his arrest for such things as weapons, instrumentalities, and fruits of the crime. Therefore, it is not a question of whether or not we shall allow a search, for the search already has the sanction of the law. It is only a question of whether evidence may be seized during the search. Such a seizure of evidence from an accused already in legal custody, therefore, will not generally subject the accused to any burden or indignity that he has not already suffered. The search allowed is limited to objects under the accused's immediate control and only allows seizure of evidentiary matter pertaining to the crime for which the accused was arrested. This carefully circumscribed seizure, limited in space and subject matter, is certainly distinguishable from a general warrant or the general exploratory search of one's personal effects in the sanctity of his home condemned by *Gouled* and *Lefkowitz*. As far as an accused is concerned, we do not believe such a seizure is an unreasonable infringement upon his personal rights.

In making the determination of what searches are reasonable we must also weigh society's interest in continuing to allow such searches. We first note that scientific examination of dust particles, paint chips, blood stains, etc., is a widespread and necessary part of scientific police investigation. Were we to deny enforcement officials the right to gather this evidence from an accused actually in custody, a necessary weapon in the arsenal of detection would be largely destroyed. In recent years the Supreme Court has announced Constitutional principles that necessarily de-emphasize the use of interrogation, and, at the same time, supposedly encourage scientific investigation. Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957). As a practical matter we cannot possibly insist that enforcement officials rely upon scientific investigation and at the same time deny them an integral part of this scientific potential. True, we must be diligent in our protection of the basic rights of an accused, but likewise we must not be derelict in protecting society from the ravages of criminal activity. We must be extremely careful not to completely disarm the enforcement officials of the weapons necessary to maintain order, which in turn would leave us all at the mercy of the unhindered criminal. Were we to uphold appellants in this case the bloody shirt worn into the police station by the murder suspect would be kept from the eyes of the jury. To us this would be deplorable folly. Therefore, we do not propose to initiate a rule that would dictate such a patently unjust result.

As to the argument that seizure of evidence from the person violates the individual's protection against self-incrimination, we do not believe that a seizure of "pure" evidence violates this right any more than the seizure of an "instrumentality" which is subsequently introduced into evidence. The Fifth Amendment guarantee that "[n]o person * * * shall be compelled * * * to be a witness against himself * * *" certainly did not demand that evidence in the possession of the accused was completely immune from governmental seizure. The seizure of such evidence is

certainly not compelling the accused to speak against himself. In fact, in no way is the accused compelled to speak or act against his self interest.

■■ Although the Constitutional issue was not raised, we recently approved the seizure of the arrested persons' clothing and the admission of scientific comparison evidence found thereon. Mc-Neely v. United States, 353 F.2d 913 (1965). Even when presented with the Constitutional issue, all the cases of which we are aware have specifically upheld, on various grounds, the validity of seizing the clothing worn by the arrested individual and subjecting the same to scientific tests later admitted into evidence. Robinson v. United States, 109 U.S.App.D.C. 22, 283 F.2d 508 (1960) cert. denied 364 U.S. 919, 81 S.Ct. 282, 5 L.Ed.2d 259; Whalem v. United States, 346 F.2d 812 (D.C.Cir. en banc 1965) cert. denied 382 U.S. 862, 86 S.Ct. 124, 15 L.Ed.2d 100; United States v. Guido, 251 F.2d 1 (7 Cir. 1958) cert. denied 356 U.S. 950, 78 S.Ct. 915, 2 L.Ed.2d 843; Nelson v. Hancock, 239 F.Supp. 857 (D. N.H.1965); United States v. Margeson, 246 F.Supp. 219 (D.Me.1965); State v. Menard, 331 S.W.2d 521 (Mo.1960); State v. Phillips, 262 Wis. 303, 55 N.W. 2d 384 (1952); Sheppard v. State, 394 S.W.2d 624 (Ark.1965); People v. Shaw, Cal.App., 47 Cal.Rptr. 96 (1965); State v. Post, 255 Iowa 573, 123 N.W.2d 11 (1963). Because of the reasons stated above, we feel it is imperative that we follow this long list of authority. It is our conclusion that the clothing of appellants was validly seized as an incident to their lawful arrest and that the admission of the evidence found thereon did not violate their rights under the Fourth or Fifth Amendment.

■■ IV. Also in regard to their detention appellants point out that they were viewed by government witnesses in the local jail without the benefit of a lineup. They argue that because of the lack of lineup the view was illegal and the witnesses were therefore disqualified to testify at the subsequent trial. Appellants cite no cases in point in support

of this argument. We believe this is probably because none exists to support such a unique position.

We know of no authority to support the proposition that a view of a prisoner is illegal absent a formal lineup. Even if such a view were in some way improper, we do not feel this would make the independent recollection of the witness inadmissible. Payne v. United States, 111 U.S.App.D.C. 94, 294 F.2d 723 (1961) cert. denied 368 U.S. 883, 82 S.Ct. 131, 7 L.Ed.2d 83. Therefore, we conclude that the method by which a government witness views an accused has no effect on the admissibility of the witnesses' testimony. The mechanics of the view might have some influence on the weight given the identification, but a less than perfectly conducted viewing obviously cannot be used as the basis for wiping out the testimony of an eye witness that personally witnessed the accused at the scene of the crime. Dixon v. United States, 7 F.2d 818 (8 Cir. 1925); Rich v. United States, 261 F.2d 536 (4 Cir. 1958) cert. denied 359 U.S. 946, 79 S.Ct. 731, 3 L.Ed.2d 678.

Appellants have thrown in the words "fruit of the poison tree." We do not believe, however, that they have any application to this case. We have held that appellants were validly arrested and detained. Further, we have held that a view by a government witness during this detention is proper regardless of whether the accused or suspect is viewed singly or in a lineup. Furthermore, it has been held that even if detention is illegal, a view during this detention does not come under the "fruit of the poison tree" doctrine. Payne v. United States, supra. In summary, the viewing witnesses were properly allowed to testify.

V. As their next point, appellants argue that the case presented to the jury was extremely complex. Numerous exhibits were admitted against one or more of the appellants but were not admissible against them all. Appellants Golliher and Wheeler specifically point to the admissions of Holmes that implicated them

in the crime, yet were inadmissible against them. Under these circumstances appellants contend that they were severely prejudiced by the joint trial, even though the trial judge properly instructed the jury to consider that admission only as evidence against Holmes. Therefore, they argue, that it was error for the trial court to deny their repeated motions for severance and separate trials.

We have examined the record and the arguments in this case and are of the opinion that the action of the trial court was proper. Rule 8(b) and Rule 13, Fed.R.Crim.P.,[2] clearly allow the joinder of defendants. Since the trial court is affirmatively empowered to order a joint trial, to be entitled to relief the appellants must affirmatively demonstrate that the joint trial has prejudiced their right to a fair trial. Fisher v. United States, 324 F.2d 775 (8 Cir. 1963). We do not believe that appellants have borne this burden. The trial court repeatedly admonished and instructed the jury as to whom the evidence was to be considered against. In the instructions the court gave careful and accurate instructions as to how each defendant should be given separate and personal consideration, that each man's guilt must be determined independently of the guilt of the others, and that evidence admitted solely against one defendant should not be considered against the other defendants. We must assume the jury was capable of assessing the evidence and followed the instructions of the court as they were bound to do by their oath. Beck v. United States, 298 F.2d 622 (9 Cir. 1962) cert. denied 370 U.S. 919, 82 S.Ct. 1558, 8 L.Ed.2d 499; Orton v. United States, 221 F.2d 632 (4 Cir. 1955)

cert. denied 350 U.S. 821, 76 S.Ct. 47, 100 L.Ed. 734. Furthermore, the evidence points overwhelmingly to the individual guilt of the appellants. Therefore, absent a clear showing that the trial court abused its discretion and because thereof appellants did not receive a fair trial, the trial court's decision must stand. The evidence indicates appellants committed the crime in concert, therefore, it is generally proper to try them in concert. The joint trial was proper.

VI. As a next major point appellants correctly relate that in the first trial of this case a young man who was in Marshal Padgett's car, Rodney Ridenour, testified that he saw appellants Golliher and Wheeler on the roof of the bank. At the second trial an affidavit was introduced indicating that Mr. Ridenour was serving with the Army in Europe. Thereafter, over objection, Mr. Ridenour's testimony at the first trial was read to the jury. Appellants interpret the introduction of Ridenour's testimony as a violation of their right of confrontation as set out in Pointer v. State of Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

Pointer v. State of Texas condemned a situation where government witnesses testified against the accused at a preliminary hearing type proceeding conducted solely before a judge. The accused was without counsel, and therefore, as a practical matter, was deprived of the opportunity to effectively cross-examine his accuser. In the absence of the witness, this testimony was read to the jury at the subsequent trial. Pointer v. State of Texas centers its reversal of the conviction around the accused's right to effectively cross-examine the accusers

---

2. Fed.R.Crim.P. reads:

Rule 8(b) "Joinder of Defendants. Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count."

Rule 13—"The court may order two or more indictments or informations or both to be tried together if the offenses, and the defendants if there is more than one, could have been joined in a single indictment or information. The procedure shall be the same as if the prosecution were under such single indictment or information."

brought before him. However, the Court specifically recognizes as Constitutional the introduction of testimony given at a former hearing where the accused was represented by counsel and had an opportunity to cross-examine the absent witness. As aptly stated by Mr. Justice Black at page 407, 85 S.Ct. at page 1069:

"This Court has recognized the admissibility against an accused of dying declarations, Mattox v. United States, 146 U.S. 140, 151, 13 S.Ct. 50, 53, 36 L.Ed. 917, and of testimony of a deceased witness who testified at a former trial, Mattox v. United States, 156 U.S. 237, 240–244, 15 S.Ct. 337, 39 L.Ed. 409. * * * Nothing we hold here is to the contrary. The case before us would be quite a different one had Phillip's statement been taken at a full-fledged hearing at which petitioner had been represented by counsel who had been given a complete and adequate opportunity to cross-examine."

In the present case Ridenour fully testified at the first trial conducted before the jury. Appellants were represented by counsel. Counsel had the opportunity, and did in fact, cross-examine the witness. This cross-examination was part of the record and was fully capable of being presented to the jury in the second trial. In both trials there was the same issue, the same burden of proof, the same judge, the same parties, the same counsel. Therefore, even under Pointer v. State of Texas appellants have been afforded an adequate opportunity to confront their accusers. Appellants' right of confrontation was not violated when the record testimony in the first trial was introduced at the second. Shaw v. United States, 1 F.2d 199 (8 Cir. 1924); Smith v. United States, 106 F.2d 726 (4 Cir. 1939); United States v. Bentvena, 319 F.2d 916 (2 Cir. 1963).

VII. Appellants' final two arguments relate to the instructions. Appellants argue that due to the natural bias of police officers, the court should have instructed that the testimony of the officers should be received with caution. Appellants cite some Nebraska cases holding that such an instruction is proper. We agree that in some cases such an instruction might be proper. We feel, however, that this instruction is not mandatory. If the trial judge feels that it is necessary, he may give this instruction. If he does not feel it is proper under the circumstances he need not. The decision on this matter is based upon his sound discretion. Certainly it is not error to fail to so instruct. Shettel v. United States, 72 App. D.C. 250, 113 F.2d 34 (1940); Siglar v. United States, 208 F.2d 865 (5 Cir. 1954) cert. denied 347 U.S. 991, 74 S.Ct. 854, 98 L.Ed. 1125.

Appellants also contend that the court's instruction on flight was erroneous due to the fact that there was no evidence that appellants were fleeing. We feel, however, that appellants' contention is without merit. There is considerable evidence which tends to indicate that appellants were leaving the scene of the crime as hastily as possible. Holmes was arrested in his car on a highway which ran from the town of Wallace a short time after a car of this description was at the scene of the crime. Golliher and Wheeler were identified by eye witnesses as being at the bank. They suddenly disappeared when the Marshal approached. They were arrested some time later walking along the railroad tracks leading away from Wallace.

The trial court submitted the issue of whether or not appellants were actually in flight to the consideration of the jury. Only after this did the court instruct that if they found beyond a reasonable doubt that appellants were in the process of flight they could use this flight as evidence of guilt of the substantive offense. We believe this procedure was wholly proper. Gicinto v. United States, 212 F.2d 8 (8 Cir. 1954) cert. denied 348 U.S. 884, 75 S.Ct. 125, 99 L.Ed. 695.

Upon viewing the entire case we feel that there is more than sufficient

evidence upon which the jury could find the individual appellants guilty beyond a reasonable doubt. We find no errors in the trial of the case. The case was tried by an able and experienced trial judge who was meticulous in affording the appellants all their Constitutional guarantees and a fair and impartial trial. The record reveals that appellants did receive a full, fair and impartial trial as well as it reveals their overwhelming guilt of the offense. Accordingly, the judgment of the District Court is affirmed.

Affirmed.