Robert BRETT, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 24666.

United States Court of Appeals
Fifth Circuit.

May 5, 1969.

M. M. Sheinfeld, Houston, Tex., for appellant.

James R. Gough, Asst. U. S. Atty., Houston, Tex., for appellee.

Before ALDRICH *, GODBOLD and DYER, Circuit Judges.

GODBOLD, Circuit Judge:

This appeal is from a conviction for unlawful importation, and unlawful facilitation of transportation and concealment, of heroin in violation of 21 U.S.C. A. § 174. The issues before us concern the validity of pre-arrest search warrants and the admissibility of evidence found in a warrantless search of appellant's clothing three days after his arrest. We conclude that the search warrants

* Of the First Circuit, sitting by designation.

were valid but that the search of appellant's clothing without a warrant was invalid, requiring reversal.

### 1. The search warrants

On February 13, 1967 an anonymous informant telephoned Agent Saez of the Federal Bureau of Narcotics in Houston, Texas, and told him that a person was mailing heroin to 203 E. Danitl Street, Eagle Lake, Texas, and that the letters were addressed to Helen Perez and Jose L. Perez or Joe Perez. The informer also said that on or about the preceding day a Western Union money order had been sent by either Paul Gomez or Paul Gonzalez Gomez to Manfredo Martinez at Miguel Aleman, Mexico, or Roma, Texas.

The same day Saez notified Customs Agent Miley of the telephone call and described the letters to him. Presumably acting on a request from Agent Miley, the postmaster at Roma, Texas, which is just across the border from Miguel Aleman, ascertained that two letters appearing to meet the descriptions given Saez had arrived in his office in the international mail on February 13. One was addressed to Helen Perez, the other to Jose L. Perez. The next day, February 14, Miley and a postal inspector (who was present at the request of the Roma postmaster and the Customs Service) examined the two letters but did not open them. This examination was made in the presence of the Roma postmaster. The postal inspector described the letters as having an unusual smell, strongly acid in nature, a quality characteristic of Mexican heroin. The inspector took possession of the letters, removed them from the normal channel of the mails, and carried them to Laredo, Texas, approximately 80 miles away. There he mailed them, in a post office penalty envelope, by registered mail, to the postal inspector at Eagle Lake.

In Houston on the 14th, in response to a call from Miley, Saez went to the Western Union office and pursuant to a subpoena secured a copy of an application dated February 11, for a six hundred dollar money order, payable to Manfredo Martinez, whose address was described as Miguel Aleman. The name given for the sender was Paul Gomez.

Two search warrants were obtained, one for each of the Perez letters, on the ground that there was reason to believe contraband heroin was being concealed in each letter. The affidavit supporting each warrant, made by Saez and Narcotics Agent-in-Charge Corbit, is quoted in the margin.[1] The testimony taken on motion to suppress has not been made a part of the record by appellant. In our view the full testimony at the trial and the affidavits of the agents sufficiently establish the validity of the warrants.

The tip from an anonymous source, considered alone, would not have

---

1. "Narcotic Agent Marion Saez advises that he received a telephone call in Houston, Texas, on 2/13/67, between 10:00 AM & 10:30 AM, from an unknown male advising that Manfredo Martinez, in Mexico, was sending up some Heroin in 2 letters to either Helen Perez or Joe L. Perez or both, at 203 E. Daniels St. or Danilt St., Eagle Lake, Texas, was not sure of the Street spelling; also advised that a man named Paul Gonzalez Gomez or Paul Gomez had sent Martinez a $600.00 Western Union Money Order from Houston, Texas to Miguel Aleman, Mexico or Roma, Texas. A copy of the Western Union Money Order contract, received by administrative subpoena, was shown to this U. S. Commissioner, & found to confirm the above information. Advised that records of the Narcotic Bureau, Houston, Texas, reflect that Manfredo Martinez is a major narcotic dealer in Miguel Aleman, Mexico. This U. S. Commissioner checked this Court's records that show in CR. 12,361—U.S.A. vs. Manfredo Bosquez Martinez, Indictment filed 9/30/54 for unlawful possession of Marijuana at Houston, Texas & is presently a fugitive. On 2/13/67 Agent Saez notified Customs Agent Kenneth A. Miley at Falcon Heights, Texas, to be on the lookout for the above described letters. On 2/14/67 Agent Corbit received information from Miley that he had found the 2 above described letters addressed to Helen Perez & Jose L. Perez & they smelled strongly of Mexican-type Heroin & said letters would be delivered to Eagle Lake Post Office at Eagle Lake, Texas."

supported the issuance of a search warrant, Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). *Cf.,* Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). But when the tip is examined together with the corroborating information contained in the affidavits a sufficient basis for the issuance of the warrants is established. The tip was corroborated in full by the independent investigation of the various governmental agencies. The two letters had been located in the international mail at Roma, Texas, each addressed to one of the persons named as potential addresses and at the exact address described. Each bore the acid smell characteristic of Mexican heroin. The dispatch of the Western Union money order had been established, sent by the named sender to the named payee at one of the addresses stated, and within the dates specified. Also the records of the United States District Court in Houston showed that a person of the same name as the payee on the money order was a fugitive from a narcotics charge in that court.[2]

The governmental agents corroborated the full spectrum of all that had been told. The affidavits established probable cause that a crime was being committed. The tip was reliable, not because of the underlying circumstances of the informer's conclusions or his past reliability but because all of the details he gave turned out to be true—at least as much as could be ascertained short of opening the letters to see if what smelled like Mexican heroin was heroin and whether it was properly stamped and packaged. *Cf.* Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L. Ed.2d 327 (1959). *Compare* Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), where the investigation corroborated only one small detail of the tip.

Armed with the search warrants, Saez and a postal inspector went to Eagle Lake on February 15 to be there when the registered envelope sent by Miley arrived. It was delivered to the inspector, opened, and the two Perez letters extracted. Saez identified the distinctive acetic acid smell. While they were examining these two letters someone—and his identity is nowhere revealed—handed the postal inspector two more letters addressed to Paul Garcia and Lily Garcia, 203 E. Danitl Street, Eagle Lake, Texas. These also had a strong acetic acid smell.

Saez notified Corbit, the narcotics agent in charge, confirmed to him the smell of the letters, and gave a more precise description of the two Perez letters. On the basis of the prior affidavits and the additional information furnished by Saez, Corbit obtained two new search warrants more precisely describing the Perez letters. We need not separately consider the validity of these two warrants.

The parties refer in briefs to warrants being issued for the Garcia letters but the record does not reveal them.

The four letters were kept in the safe at the Eagle Lake post office and the delivery window kept under surveillance. On February 18 they were delivered to appellant's sister-in-law, who came to get them at appellant's request. She was trailed from the post office by narcotics agents, arrested and contemporaneously served with what is described as "the search warrant." The sister-in-law gave the agents all four letters from her purse, still unopened. The agent opened all the letters, conducted a field test and found all four contained an opium derivative, which subsequently tested out to be heroin.

It is our opinion that the warrants validly authorized the seizure, opening and search of the two Perez letters. The record before this court does not contain warrants for the Garcia letters, or affidavits supporting warrants, so that we

---

**2.** We do not rely upon the statement in the affidavit that "records of the Narcotics Bureau, Houston, Texas, reflect that Manfredo Martinez is a major narcotics dealer in Miguel Aleman, Mexico."

are unable to pass on the validity of the seizure, opening and search of those two letters.[3] Appellant has not raised the issue whether the acts of the postal authorities in temporarily intercepting, and examining though not opening, the letters before issuance of search warrants, were acts either unconstitutional or otherwise illegal so as to taint the warrants. Since a new trial is required, we leave all of these isues for determination at that time, if raised.

2. The search of appellant's clothing

Appellant was arrested on the afternoon of February 18. He was searched at that time, though not thoroughly, and taken before the United States Commissioner and then to jail. There was testimony that customarily prisoners being booked into this jail are thoroughly searched. Appellant was given prison garb, and his clothing and effects were put in a bag in the prisoners' property room. There was no evidence that this was for any purpose other than routine safekeeping of the effects of an accused required to don prison garb when jailed. Three days later, for reasons not stated, Agent Corbit came to the jail and requested the deputy-custodian to inspect the contents of appellant's property bag, which still was in the property room. The deputy found in the watch pocket of appellant's trousers cellophane papers which he turned over to Corbit. On examination these were found to have in them traces of heroin. The cellophane papers and the results of the examination of them were admitted into evidence for the limited purpose of showing

intent. The prosecution also referred to this in oral argument.

■ The search was invalid and the fruits not admissible for any purpose. The burden is upon the government to show that the search fell within one of the exceptions to the Fourth Amendment requirement of a warrant. Barnett v. United States, 384 F.2d 848 (5th Cir. 1967). No such showing was made.

This search was not incident to an arrest, because it was not even close to contemporaneous. The items introduced into evidence were not items seized at the time of arrest for subsequent use as evidence, as in such cases as United States v. Caruso, 358 F.2d 184 (2d Cir. 1966) and Miller v. Eklund, 364 F.2d 976 (9th Cir. 1966), nor were they the result of a subsequent search or inspection of items so seized. This search was not a later look at items which had remained in police custody after having been discovered in an earlier and valid search, as in Baskerville v. United States, 227 F.2d 454 (10th Cir. 1955). Nor was it like the search in Vaccaro v. United States, 296 F.2d 500 (5th Cir. 1961) in which marihuana was validly found in a car at the time of arrest and the car, after being impounded, was searched more thoroughly the following day.

■ The "plain view" exception is inapplicable to the belated search of appellant's clothing.[4] The search was unrelated to the duties of the police as guardians of the prisoner's property, to

3. The government stands squarely on the search warrants. No contention has been made that the sister-in-law consented, or could consent, or that seizure of the letters and opening and search of them were authorized incident to the arrest.

4. In Evalt v. United States, 382 F.2d 424 (9th Cir. 1967) a post-arrest search of defendant's packsack by an FBI agent was held valid, but the search was to compare the serial numbers on money contained in the packsack and already observed by the sheriff with the serial numbers of money that had been stolen.

Westover v. United States, 394 F.2d 164 (9th Cir. 1968) is similar to Evalt and to Baskerville, supra. It held that the police validly could look at the serial numbers on currency which had been taken from the prisoner at the time of arrest and put in the prisoners' property room. The numbers could have been listed when the money was taken into police custody because plainly visible, so the police could look at the bills again later. Westover rests squarely on Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968), a "plain view" case.

inventory or to protect property in their hands for safekeeping. The clothing was not in danger of being removed elsewhere, as in the case of automobiles, or of being destroyed, and it was not available to appellant as the source of escape weapons.

We note that there was ample opportunity to apply for a search warrant, to submit to a magistrate the evidence which the officer deemed sufficient to justify the late search of appellant's stored clothing. In this case "[t]he need for effective law enforcement is not satisfied as against the right of privacy by any necessity for the officer to take the decision into his own hands." Rent v. United States, 209 F.2d 893, 899 (5th Cir. 1954). *Accord*, Williams v. United States, 382 F.2d 48 (5th Cir. 1967); Barnett v. United States, *supra*.

■■ The fact that the police have custody of a prisoner's property for the purpose of protecting it while he is incarcerated does not alone constitute a basis for an exception to the requirement of a search warrant. Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964); Barnett v. United States, *supra*; Williams v. United States, *supra*. Of course, property in police custody may be subject to warrantless searches under exceptions springing from reasons other than custody alone.[5] The focus in Fourth Amendment cases today is on privacy

rather than on property rights. *E. g.* Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Warden, Maryland Penitentiary v. Hayden, *supra*.

We are not prepared to say that an accused whose effects are held by the police for safekeeping has, by the single fact alone of the police custody of the property, surrendered his expectations of the privacy of those effects.

■ The government urges that the search be held valid by analogy to laboratory testing without a warrant of the clothing of a jailed person.[6] We decline to accept the invitation. Examination of the laboratory test cases discloses that with few exceptions they are concerned with testing of clothing seized incident to arrest. *See, e. g.*, Golliher v. United States, *supra*, 362 F.2d at 602 and cases cited therein.

Reversed and remanded.

ALDRICH, Circuit Judge (dissenting in part).

With respect to the search of the defendant's clothing it seems to me that there is a material difference between breaking into the trunk of a car that has merely been taken into protective custody, Preston v. United States, 1964, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777, and reaching into the pocket of trousers removed from a prisoner. It is doubtless true that the fact that prem-

---

5. While we need not reach the point, we note that the search is at least questionable on another ground. Warden, Maryland Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) rejects the distinction between "mere evidence" and fruits and instrumentalities of the crime and contraband. But it points out there must be a nexus between the item to be seized and criminal behavior—"Thus in the case of 'mere evidence,' probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction." 387 U.S. at 307, 87 S.Ct. at 1650. The reason for, or object of, the belated search of appellant's clothing was not explained. While it might have been

connected up, on the face of the matter it is not clear how the search of appellant's clothing in Houston has sufficient nexus to the mailing of letters containing heroin 6 or 7 days before Mexico. The trial judge appears to have had some of the same doubt, since the results of the search were admitted only on the issue of intent.

6. The government cites the following cases: Hancock v. Nelson, 363 F.2d 249 (C.A. 1, 1966); Golliher v. United States, 362 F.2d 594 (C.A. 8, 1966); Robinson v. United States, 109 U.S.App. D.C. 22, 283 F.2d 508 (1960), cert. den. 364 U.S. 919, 81 S.Ct. 282, 5 L.Ed.2d 259, and United States v. Guido, 251 F.2d 1 (C.A. 7, 1958).

ises, whether real estate, or an automobile, could be searched at the time of the arrest does not mean that the police are free to return later. In such case what is involved is a new entry into property not truly possessed. The question in the case at bar should be the type of dominion which the authorities exercised over the clothes, whether mere custody, or full possession. *Cf.* Cooper v. California, 1967, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730.

This may be tested by asking the question whether, had the defendant demanded the return of his clothes prior to trial, the demand would have been enforceable. I would say not. This must be the assumption in Miller v. Eklund, 9 Cir., 1966, 364 F.2d 976. *Accord,* Margeson v. United States, 1 Cir., 1966, 361 F.2d 327, cert. denied 385 U.S. 830, 87 S.Ct. 68, 17 L.Ed.2d 66. My brethren would distinguish *Miller,* but I find it hard to think that if clothes can be introduced into evidence one cannot look into the pocket. I also find it hard to differentiate in principle between a search of the clothes three days after the arrest, and six hours after, United States v. Caruso, 2 Cir., 1966, 358 F.2d 184. Regardless of the court's jocosity, the arrest in *Caruso* was long over. The case there, and here, seems distinguishable from *Preston* not in terms of the number of hours after the arrest, but in terms of the nature of the possession. Again I cite Cooper v. California, *supra.*

The court would also distinguish the government's laboratory examination cases on the ground that in the case at bar the clothing was not "seized" at the time of the arrest. It is merely this court's legal conclusion that the clothing was not "seized" here—concededly it was taken.

Finally, I do not understand the court's assertion that the purpose of the search was unconnected with the crime in question. Rather, it seems to me, it was connected with that crime and none other. The finding of heroin indicia in the defendant's possession was precisely calculated to meet the defense that the addressing of the original shipment to him was a mistake and that he was unconnected with the traffic.

By a process of distinguishing all other cases this court has become the first to hold, so far as appears, that a defendant's right of privacy is not infringed if his trousers are removed and searched today, but is invaded if the police return tomorrow to the clothes locker. I dislike being a disagreer, but this seems to me a pointless nicety.