STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
ROBERT EMILIO BISACCIA, DEFENDANT-APPELLANT.

Argued May 17, 1965—Decided August 11, 1965.

Mr. *Daniel E. Isles* argued the cause for appellant (*Mr. Frank P. Villanova,* of counsel and on the brief; *Messrs. Querques & Isles, Mr. Michael A. Querques,* attorneys).

506

*Mr. Archibald Kreiger*, Assistant Prosecutor, argued the cause for respondent (*Mr. John G. Thevos*, Passaic County Prosecutor, attorney).

The opinion of the court was delivered by

WEINTRAUB, C. J. The Appellate Division granted defendant leave to appeal from an interlocutory order denying his motion to suppress evidence seized under a search warrant. We certified the matter before argument in that court.

Two men committed an armed robbery. One was caught fleeing from the scene. The other, alleged to be this defendant, made good his escape, but in the course of it he lost his hat and gloves and left a pair of footprints in muddy soil. Plaster casts were made of the footprints. Later a warrant issued for a search in defendant's apartment for a pair of shoes "with half moon heel." Shoes so described were there seized, and defendant's motion was designed to bar their use against him at the trial.

Defendant contends the shoes are "mere evidence" of crime and as such may not be the subject of a search under the Fourth Amendment to the Federal Constitution. Defendant says our rule of court, *R. R.* 3:2A–2, is invalid insofar as it provides otherwise in subparagraph (c), and he refers to the question raised in that regard in *State v. Naturile*, 83 *N. J. Super.* 563, 577 (*App. Div.* 1964). The entire rule reads:

"A search warrant may be issued to search for and seize any property:

(a) Obtained in violation of the penal laws of this State or any other state; or

(b) Possessed, controlled, designed or intended for use or which has been used in connection with the violation of the penal laws of this State or any other state; or

(c) Constituting evidence of or tending to show any such violation."

The trial court held the shoes were used in connection with a violation of law within subparagraph (b) of the rule, and being thus an "instrumentality" for the commission of crime, as that term is used in this area, they were subject to search

and seizure. The State presses that view before us. It argues also that such tangible articles are not within the federal decisions barring a search for "mere evidence." The State further contends that in any event we are free under *Ker v. State of California*, 374 *U. S.* 23, 83 *S. Ct.* 1623, 10 *L. Ed.* 2d 726 (1963), to develop our own "workable rules" of search and seizure and to permit a search for evidence even though it be invalid for federal purposes under decisions of the United States Supreme Court. As to this last proposition, we doubt the states have leeway from the view of the Supreme Court upon this topic. In any event we are satisfied the shoes are not "mere evidence" within the meaning of the federal decisions relied upon.

The concept that mere evidence may not be the subject of a search warrant is attributed to *Boyd v. United States*, 116 *U. S.* 616, 6 *S. Ct.* 524, 29 *L. Ed.* 746 (1886). That case involved a forfeiture proceeding under the customs laws. Pursuant to a statute defendant was there ordered to produce certain invoices upon pain of an adverse finding of fact if he failed to obey. The Supreme Court unanimously held the statute violated the provision of the Fifth Amendment that no person "shall be compelled in any criminal case to be a witness against himself." Two members of the Court believed there was no search or seizure and hence that the Fourth Amendment was inapplicable, but the majority of the Court, speaking through Mr. Justice Bradley, found the Fourth Amendment also stood in the way. Their reliance upon the Fourth provoked unending controversy.

Advocates of the view that a search may not be made for mere evidence say the State may search only for (1) the fruits of crime, (2) things used or intended to be used in the commission of crime, and (3) contraband. The rationale is supposed to be that the State may seize only what the accused is not entitled to possess under principles of property law. More specifically, as to the three categories just mentioned it is said a defendant has no property right in any of them because the fruit of the crime belongs to the victim, things used

or intended to be used in crime become the property of the State under an expansion of the ancient concept of deodand, and there can be no private right in what the law denounces as contraband. Thus when the State searches for such items it is pursuing a possessory right either of its own or of the victim of crime. No trace of that thesis can be found on the face of the Fourth Amendment:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Nonetheless it is said to be etched by the action of the Fifth Amendment upon the Fourth.

If the subject is examined upon principle alone, the property thesis cannot explain government's authority to search. We know that what is seized is in fact taken primarily to be used against the accused rather than to deprive him of some property he ought not to have or to gratify the right of another to acquire the article for its intrinsic worth. When the State searches for a bloodied ice pick, it is not at all interested in its penny value; the State could buy dozens of new ones at a fraction of the cost. Moreover, the question whether the article seized is the fruit of the crime, or is contraband, or has been forfeited by evil use, would frequently depend upon the outcome of the very proceeding in which it is offered to prove guilt. Yet we permit its use against the accused without a prior trial as to his right to possess it, a course which is indefensible if in truth the State's right to use the article depends upon proof that the property right reposes in the State or someone else.

The right-to-possession rationalization of the law of search and seizure is too feeble and too contrived to endure. If "evidence" as such may not be seized under the Fourth Amendment, if that amendment affords but a summary remedy in replevin to satisfy the property right of government or of some third party in the things to be seized, then simple honesty

would demand that nothing taken from an accused be used against him, however lawful the search. It would demean the law to vindicate a search and seizure in terms of a proprietary interest when everyone knows the quest is usually for evidence of guilt and nothing else. It must be that the right-to-possession thesis is quite irrelevant and that the Fourth Amendment does permit the search and seizure of things for their inculpatory worth.

But it is said the Fifth Amendment requires that interpretation of the Fourth. How this comes about is quite unclear. Indeed, the Fourth and Fifth Amendments are incompatible in their immediate operative effect. Whereas the Fifth Amendment forbids the use of any force whatever to compel a person to testify or to produce evidence of his wrong, the Fourth permits the use of all the strength of government to extract from a man's possession things which will convict him. And the property thesis discussed above has nothing to do with the protection afforded by the Fifth; the result in *Boyd* would have been the same if the order there involved sought to compel the individual to hand over the fruit of crime, or the instrument of crime, or pure contraband, as distinguished from some other "evidence" in which the accused's right of ownership was impeccable. In short, while the Fifth Amendment shields the person of the individual in unqualified terms, the Fourth Amendment affords no such protection for his possessions or even his person if he resists the search, but rather, recognizing that possessions may be seized by might, seeks to spell out limitations which will strike a fair balance between a man's privacy in his things and the duty of government to protect all citizens from criminal conduct.

No doubt the Fifth Amendment and the restraints in the Fourth seek to protect related values even though the nature and extent of the protection vary. So an attempt to use against a man things taken from him in violation of the Fourth Amendment could invite the question whether the Fifth was intended to shield him from it. Mr. Justice Black took that view of the Fifth in his separate opinion in *Mapp v.*

510

*Ohio*, 367 *U. S.* 643, 81 *S. Ct.* 1684, 6 *L. Ed. 2d* 1081, 1093 (1961); see *State v. Smith*, 37 *N. J.* 481, 487 (1962), *cert.* denied 374 *U. S.* 835, 83 *S. Ct.* 1879, 10 *L. Ed. 2d* 1055 (1963). But it is not apparent how the Fifth Amendment can make illegal a search and seizure which the Fourth Amendment permits. The Fourth has its own expressed limitations upon search and seizure; there is no reason to suppose the framers of the Amendments intended to imply through the Fifth an additional limitation upon the Fourth.

The proposition that the Fifth Amendment somehow forbids the acquisition of "evidence" by a search under the Fourth Amendment has been disputed in academic discussions of the subject. *Maguire, Evidence of Guilt, p.* 182 (1959); 8 *Wigmore, Evidence* §§ 2184a and 2264 (*McNaughton rev.* 1961); Corwin, "The Supreme Court's Construction of the Self-Incrimination Clause," 29 *Mich. L. Rev.* 1, 16, and 205 (1930); Kamisar, "The Wiretapping-Eavesdropping Problem: A Professor's View," 44 *Minn. L. Rev.* 891, 914–917 (1960); Note, "Search and Seizure in the Supreme Court: Shadows on the Fourth Amendment," 28 *Univ. Chi. L. Rev.* 664 (1961); Note, "Limitations on Seizures of 'Evidentiary' Objects: A Rule in Search of a Reason," 20 *Univ. Chi. L. Rev.* 319 (1953). True, historical support may be found for the proposition that the portion of the Fourth Amendment prohibiting "unreasonable" searches and seizures means something beyond the specific requirements thereafter set forth, *i.e.*, probable cause supported by oath or affirmation and a particular description of the place to be searched and the person and things to be seized, see Reynard, "Freedom from Unreasonable Search and Seizure," 25 *Ind. L. J.* 259, 275–276 (1950), but it remains obscure how this "double barrelled" aspect of the Fourth Amendment justifies the conclusion that the amendment forbids a search for "evidence" as such or how the Fifth Amendment suggests the Fourth should be so construed. The ban upon unreasonable searches has ample room for operation with respect to searches without a warrant, and it may also restrain the sweep of a search

with a warrant, but it is hardly necessary, to give content to this prohibition, to say it bars a search for things which are "mere evidence."

It seems to us that *Boyd* laid down no such rule. Although Mr. Justice Bradley did refer to the property-right-to-possession theme in his discursive treatment of the history of the subject, that account was not intended to reflect the foundation upon which the Fourth Amendment stands. Rather the history he found instructive and compelling was that of the general warrant under which, without a finding of probable cause and without specificity, emissaries of the Crown were ordered to seize or rummage through a man's private papers in the hope that something incriminatory would be uncovered. It was the exploratory invasion of a man's privacy in his papers to which Mr. Justice Bradley addressed the views that are here involved. This, we think, is evident from his heavy reliance upon the celebrated opinion of Lord Camden in *Entick v. Carrington,* 19 *Howell St. Tr.* 1029 (1765).

*Entick* involved a search with respect to a libel of government. This was the area in which over the centuries the general warrant had been invoked to suppress dissent and heresy. See *Stanford v. State of Texas,* 379 *U. S.* 476, 85 *S. Ct.* 506, 13 *L. Ed. 2d* 431 (1965). A general warrant issued against Entick, without a judicial finding of probable cause as to the commission of an offense or his complicity in it. The warrant directed the arrest of Entick and the seizure of all of his private papers. In the words of Lord Camden (at *p.* 1063):

"This, though it is not the most difficult, is the most interesting question in the cause; because if this point should be determined in favour of the jurisdiction, the secret cabinets and bureaus of every subject in this kingdom will be thrown open to the search and inspection of a messenger, whenever the secretary of state shall think fit to charge, or even to suspect, a person to be the author, printer, or publisher of a seditious libel."

Lord Camden held the general warrant to seize all of a man's papers was unauthorized by law. Referring to offenses

"that are more atrocious than libelling," he said "our law has provided no paper-search in these cases to help forward the conviction" (at *p.* 1073). Cooley, in anticipating the *dictum* of *Boyd,* spoke also of "the seizure of one's papers in order to obtain evidence against him," *Constitutional Limitations* (3*d ed.* 1874) *p.* 347, *fn.* 3, and of the doubtful validity of a statute which would permit "the examination of books and papers with a view to discover the evidence of crime," saying that only "in extreme cases" should such process be authorized because under it "the citizen should be liable to have his premises invaded, his desks broken open, his private books, letters, and papers exposed to prying curiosity, and the misconstructions of ignorant and suspicious persons" (at *p.* 348).

So in *Boyd* Mr. Justice Bradley summed up Lord Camden's opinion in terms of the extortion of evidence from a man's private papers, saying (116 *U. S.,* at *p.* 630, 6 *S. Ct.,* at *p.* 532, 29 *L. Ed.,* at *p.* 751):

"The principles laid down in this opinion affect the very essence of constitutional liberty and security. They reach further than the concrete form of the case then before the court, with its adventitious circumstances; they apply to all invasions on the part of the government and its employes of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offense; but it is the invasion of his indefeasible right of personal security, personal liberty, and private property, where that right has never been forfeited by his conviction of some public offense, — it is the invasion of this sacred right which underlies and constitutes the essence of Lord Camden's judgment. Breaking into a house and opening boxes and drawers are circumstances of aggravation; but *any forcible and compulsory extortion of a man's own testimony, or of his private papers to be used as evidence to convict him of crime, or to forfeit his goods, is within the condemnation of that judgment.* In this regard the fourth and fifth amendments run almost into each other." (Italics added)

He continued (116 *U. S.,* at *p.* 633, 6 *S. Ct.,* at *p.* 534, 29 *L. Ed.,* at *p.* 752):

"We have already noticed the intimate relation between the two amendments. They throw great light on each other. For the "unreasonable searches and seizures' condemned in the fourth amendment

are almost always made for the purpose of compelling a man to give evidence against himself, which in criminal cases is condemned in the fifth amendment; and compelling a man 'in a criminal case to be a witness against himself,' which is condemned in the fifth amendment, throws light on the question as to what is an 'unreasonable search and seizure' within the meaning of the fourth amendment. *And we have been unable to perceive that the seizure of a man's private books and papers to be used in evidence against him is substantially different from compelling him to be a witness against himself.* We think it is within the clear intent and meaning of those terms." (Italics added)

With respect to the relationship between self-incrimination and search-and-seizure, Lord Camden did not say that things seized may not be used to convict a man. Rather, speaking of the law's condemnation of a "paper-search," he said (at *p.* 1073):

"Whether this proceedeth from the gentleness of the law towards criminals, or from a consideration that such a power would be more pernicious to the innocent than useful to the public, I will not say.

It is very certain, that the law obligeth no man to accuse himself; because the necessary means of compelling self-accusation, falling upon the innocent as well as the guilty, would be both cruel and unjust; and it should seem, that search for evidence is disallowed upon the same principle. There too the innocent would be confounded with the guilty."

Thus Lord Camden did not find in the privilege against self-incrimination a restraint upon the Crown's right to search but rather said that both the individual's privilege and the Crown's right must be understood in the light of the need to protect the innocent from oppression, and so viewed, *a paper-search* under the general warrant before him was intolerable.

In the passages from *Boyd* quoted above Mr. Justice Bradley spoke vaguely of the connection between the Fourth and Fifth Amendments saying, with respect to "any forcible and compulsory extortion of a man's own testimony, or of his private papers," that "In this regard the fourth and fifth amendments run almost into each other." He was "unable to perceive that the seizure of a man's private books and papers to be used in evidence against him is substantially different from compelling him to be a witness against himself." Thus

neither Lord Camden nor Mr. Justice Bradley suggested that the use against a man of any and everything seized in a search would violate the privilege against self-incrimination or that a search could not be maintained to that very end. What they denounced in those terms was a search among private papers, and this because of the extraordinary regard the law has for the privacy that reposes in them.

It is not clear whether in discussing the Fourth Amendment Mr. Justice Bradley spoke only against a general warrant to seize all of a man's papers or whether he meant to condemn as well the search for a specific paper among a man's general files since even though the paper be specifically described in a warrant, the search for it could involve the same excursion through all of a man's papers which the general warrant had ordered. In any event he nowhere intimated he had in mind a bloody shirt or the like—things that could be found without rummaging through a man's private files. His thrust was against an invasion of the personal privacy in one's papers and documents. This too was the principal emphasis in *Weeks v. United States*, 232 *U. S.* 383, 34 *S. Ct.* 341, 58 *L. Ed.* 652 (1914), which involved a search among papers made without warrant.

*Gouled v. United States*, 255 *U. S.* 298, 41 *S. Ct.* 261, 65 *L. Ed.* 647 (1921), involved a search and seizure of private papers under a warrant which apparently was sufficiently specific in its description of what was to be taken. The offense involved was a conspiracy to defraud the United States. The papers taken were an unexecuted contract, an executed contract, and a bill for legal services. In finding the search invalid, the Court deemed the test to be whether the government had a property right to possess the papers. In that vein it recognized that as to the executed contract the government "would have a legitimate and important interest in seizing such a paper in order to prevent further frauds" (255 *U. S.*, at *p.* 310, 41 *S. Ct.*, at *p.* 265, 65 *L. Ed.*, at *p.* 653), but added that the record before it did not reveal the facts necessary for that evaluation. The Court relied upon *Boyd*

and *Weeks* but, it seems to us, departed from the real thesis of those cases by positing the result upon an inquiry into the situs of the right of possession rather than upon the protection of private papers. At any rate *Gouled* indicated the doctrine of *Boyd* would not accord complete immunity to private papers for it suggested that papers used in a criminal activity might be taken even though the search involved the invasion of a man's private files.

 Subsequent cases make it clear that the private papers of an individual may be seized and introduced into evidence if the papers were used in the criminal operation. See *Marron v. United States,* 275 *U. S.* 192, 48 *S. Ct.* 74, 72 *L. Ed.* 231 (1927); *United States v. Lefkowitz,* 285 *U. S.* 452, 52 *S. Ct.* 420, 76 *L. Ed.* 877 (1932); *Davis v. United States,* 328 *U. S.* 582, 66 *S. Ct.* 1256, 90 *L. Ed.* 1453 (1946); *Zap v. United States,* 328 *U. S.* 624, 66 *S. Ct.* 1277, 90 *L. Ed.* 1477 (1946); *Harris v. United States,* 331 *U. S.* 145, 67 *S. Ct.* 1098, 91 *L. Ed.* 1399 (1947); *Abel v. United States,* 362 *U. S.* 217, 80 *S. Ct.* 683, 4 *L. Ed.* 2d 668 (1960). Whether those cases permit papers to be seized on the strained and unlikely thesis mentioned above, that their misuse divests the owner of his property in them and entitles government to their possession for their minuscule paper value, or whether they approve the seizure simply because it is fair and reasonable and sensible to use them as evidence, need not be further explored. The significant fact, for the purpose of the case at hand, is that the United States Supreme Court has never held that the doctrine of *Boyd* applies to tangibles other than private papers.

 There is a marked difference between private papers and other objects in terms of the underlying value the Fourth Amendment seeks to protect. As we have said, private papers are almost inseparable from the privacy and security of the individual. To browse among them in search of anything inculpatory involves an exploratory search indistinguishable from the search under the general warrant which the Fourth Amendment intended to outlaw. See *United States v. Kir-*

*schenblatt*, 16 *F. 2d* 202, 203, 51 *A. L. R.* 416 (2 *Cir.* 1926). Indeed, even a search for a specific, identified paper may involve the same rude intrusion if the quest for it leads to an examination of all of a man's private papers. Hence it is understandable that some adjustment may be needed, and presumably it is to that end that a search may not be made among a man's papers for a document which has evidential value alone. Even as to private papers, this "mere evidence" limitation upon a search is not an easy line to defend, but Judge Learned Hand did find in it a redeeming feature in these terms in *United States v. Poller*, 43 *F. 2d* 911, 914, 74 *A. L. R.* 1382 (2 *Cir.* 1930):

"* * * Nevertheless, limitations upon the fruit to be gathered tend to limit the quest itself, and in any case it is something to be assured that only that can be taken which has been directly used in perpetrating a crime. The remedy may not be very extensive, but it is something, and it is all that can be given, as we understand the present decisions. A man is certainly subject to some search of his premises upon his arrest; if it would have been better to allow nothing without warrant but a search of his person, it is too late to hold so now."

But a search for other tangibles involves none of the hazards which concerned the courts in *Entick* and *Boyd*. There is no rummaging through a man's private files, no exposure of their intimacies and confidences. We must remember that the Fourth Amendment prohibits "unreasonable" searches and seizures and that the rule of *Boyd* is simply an application of the rule of unreasonableness to the specific subject matter there involved. When that rule or any other subsidiary rule evolved in the application of the Fourth's prohibition against unreasonableness is sought to be applied beyond the setting in which the subsidiary rule was devised, we must measure the proposed application against the basic test laid down in the Amendment itself and ask whether the search or seizure is unreasonable.

If we thus approach the issue before us, the answer seems plain, for there is nothing unreasonable about searching for a pair of shoes to match them with a culprit's foot-

print. Surely if the accused were wearing the shoes at the time of his arrest, no one would seriously question the legality of their seizure for comparison with the casts made at the scene of the crime and the use of the shoes as evidence if they did fit. The bloody shirt is routinely used as evidence against the accused. See *Morton v. United States*, 79 *U. S. App. D. C.* 329, 147 *F. 2d* 28, 30 (1945), *cert.* denied 324 *U. S.* 875, 65 *S. Ct.* 1015, 89 *L. Ed.* 1428 (1945); *People v. Chiagles*, 237 *N. Y.* 193, 142 *N. E.* 583, 584, 32 *A. L. R.* 676 (*Ct. App.* 1923).

■ It is true, as held in *United States v. Guido*, 251 *F. 2d* 1 (7 *Cir.* 1958), *cert.* denied 356 *U. S.* 950, 78 *S. Ct.* 915, 2 *L. Ed.* 2d 843 (1958), and by the trial court in the case before us, that the shoes could be deemed an instrumentality of the crime, for a robber could hardly pursue his plans in the nude. Indeed the more ordinary the garb the more it supports a criminal venture. But we are reluctant to resort to anything so frivolous as the property-right-to-possession theme. The law should not forfeit everything an offender wears to arrive at the sensible result that an article of clothing may be used according to its true probative force. Moreover the property theme would be hard pressed if a man were believed to have committed a murder in his home or his office or his automobile and the State sought to search for blood stains on the floor or upholstery. Nor should we have to declare a corpse the fruit of crime to enable the police to search for it. It is far more palatable to say directly that title and possession are beyond the point; that the Fourth Amendment, striking a balance between the right of the individual suspected of crime and the duty of the State to protect its citizens, permits a search for the avowed purpose of finding evidence with which to convict, so long at least as there is not involved the evil of the general warrant, the unrestricted invasion of the privacy of a man's papers with which *Boyd* and *Entick* were concerned.

There are very few cases in which the facts seriously raised the question whether tangibles other than papers and docu-

ments may be seized for their evidential worth alone. The paucity no doubt is due to the common acceptance of the proposition that such articles are admissible. Surely they have been routinely received in evidence in our State. Oddly the few reported cases are in disagreement and they turned upon whether the court chose to label the article an instrumentality of crime rather than "mere evidence" of it. We have referred to *Guido* where shoes were held to be a means of committing a crime and seizable on that ground. In *LaRue v. State*, 149 *Tex. Cr. App.* 598, 197 *S. W. 2d* 570 (1946), bloodied clothing was deemed to be evidentiary only and excluded for that reason. But *Boles v. Commonwealth*, 304 *Ky.* 216, 200 *S. W. 2d* 467 (*Ct. App.* 1947), held the defendant's clothing may be seized under a warrant for its probative value. In *State v. Chinn*, 231 *Or.* 259, 373 *P. 2d* 392 (*Sup. Ct.* 1962), a camera, empty beer bottles and bed sheets were admitted into evidence on a charge of statutory rape, upon a finding that they were used as a means for the commission of the crime within the meaning of a statute restricting the issuance of a warrant to things so used. On the other hand, *Morrison v. United States*, 104 *U. S. App. D. C.* 352, 262 *F. 2d* 449 (1958), held that a handkerchief, used apparently after a crime of perversion, was not an instrumentality of the offense, and being evidentiary only, was inadmissible under the assumption, we think erroneous, that the "mere evidence" rule applicable to private papers applies to other tangible articles as well.

This resume of the few cases at least suggests how unreal is the question whether an article is or is not a means for the commission of a crime, and how irrelevant that inquiry must be to the values which underlie the mandate of the Fourth Amendment that a search shall not be unreasonable. Here there is no echo of the general warrant or the writ of assistance.

█ The truth is that government searches and seizes to obtain evidence of guilt. As we said earlier, if a search may be made only to obtain articles for their intrinsic pecuniary

worth to government or to a third person, then common integrity would demand that nothing so obtained be used to convict the man from whom they were taken. The answer is that the Fourth Amendment contemplates that things may be seized for their inculpatory value alone and that a search to that end is valid, so long as it is not otherwise unreasonable and the Fourth Amendment's formal requirements, if applicable, are met.

The order denying the motion to suppress is affirmed.

*For affirmance* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, HALL and SCHETTINO—5.

*For reversal*—None.