2004 OK 58

**Teddy DUNCAN, for himself and all others similarly situated, Plaintiff/Appellant,**

v.

**OKLAHOMA DEPARTMENT OF CORRECTIONS, an agency of the State of Oklahoma, and Ron Ward, Director, Defendants/Appellees.**

No. 98,295.

Supreme Court of Oklahoma.

July 6, 2004.

William H. Stout of Carpenter & Laquer, Oklahoma City, OK, for Plaintiff/Appellant.

Charles K. Babb, Assistant Attorney General, Oklahoma City, OK, for Defendants/Appellees.

LAVENDER, J.

¶ 1 Plaintiff/appellant/inmate, Teddy Duncan sued defendants/appellees, the Oklahoma Department of Corrections (DOC) and its Director, Ron Ward. He challenged DOC's right to retain, for costs of incarceration, one hundred percent (100%) of workers' compensation permanent total disability (PTD) benefits paid to him during his incarceration. The PTD benefits were awarded to plaintiff by the Oklahoma Workers' Compensation Court (WCC) for work-related injury occurring prior to his imprisonment while he was employed by O G & E Energy Corporation.[1] Defendants moved to dismiss pursuant to 12 O.S.2001, § 2012(B)(6), arguing plaintiff's trial court petition was subject to dismissal for failure to state a claim upon which relief could be granted. In essence, interpreting 85 O.S.2001, § 22(13)(b) to allow DOC to retain all PTD benefits paid during his incarceration, the trial court issued its Order Granting Defendants' Motion to Dismiss.[2]

¶ 2 Plaintiff appealed and the Court of Civil Appeals (COCA), Division III, affirmed. He sought certiorari review which we previously granted because the case involves a first impression question. We hold, although 57 O.S.2001, § 549(B)(1) allows DOC to charge, for costs of incarceration, no more than fifty percent (50%) of amounts from an inmate's prison employment or other income, including workers' compensation benefits, received on behalf of an inmate and deposited to his/her DOC-maintained inmate account, § 22(13)(b), a more specific and recent expression of legislative intent, mandates DOC

retention, for costs of incarceration, of all workers' compensation PTD benefits paid to an inmate during his/her incarceration. Thus, we affirm the trial court's dismissal.

## PART I. STANDARD OF REVIEW AND STATUTORY INTERPRETATION JURISPRUDENCE.

■ ¶ 3 In this case we gauge the meaning of § 549(B)(1) and § 22(13)(b), and decide which controls the fate of plaintiff's PTD benefits paid during his imprisonment. Confronting us is a question of law. "A legal question involving statutory interpretation is subject to *de novo* review ..., i.e., a non-deferential, plenary and independent review of the trial court's legal ruling." *Fulsom v. Fulsom*, 2003 OK 96, ¶ 2, 81 P.3d 652, 654, citing *Samman v. Multiple Injury Trust Fund*, 2001 OK 71, ¶ 8 and n. 5, 33 P.3d 302, 305 and n. 5.

■ ¶ 4 The appellate review standard regarding a trial court's dismissal for failure to state a claim upon which relief can be granted is also *de novo*, as the ultimate inquiry revolves around ascertaining the legal sufficiency of a plaintiff's petition. *Hayes v. Eateries, Inc.*, 1995 OK 108, 905 P.2d 778, 780. *Hayes* stated:

Review of a trial court's dismissal for failure to state a claim upon which relief can be granted is *de novo* and involves consideration of whether a plaintiff's petition is legally sufficient. *Gay v. Akin*, 766 P.2d 985, 989 f.n. 13 (Okla.1988). When reviewing such a dismissal an appellate court must take as true all of the challenged pleading's allegations together with all reasonable inferences which may be drawn from them. *Great Plains Federal Savings and Loan Association v. Dabney*, 846 P.2d 1088, 1090 f.n. 3 (Okla.1993). "A pleading *must not* be dismissed for failure to state a

1. Plaintiff/appellant/inmate, Teddy Duncan's suit against defendants/appellees, the Oklahoma Department of Corrections (DOC) and its Director, Ron Ward, was brought on behalf of himself and other similarly situated inmates, i.e., plaintiff sought to litigate the case as a class action. The record presented to us does not show a ruling by the trial court as to class certification, presumably because the trial court determined plaintiff's suit was subject to dismissal.

2. Deciding the issue involved a question of law, the trial court's August 2002 Order Granting Defendants' Motion to Dismiss also ruled plaintiff would be unable to amend his petition to state a cognizable claim. We also note, 12 O.S. 2001, § 2012 was amended by 2002 Okla. Sess. Laws, Ch. 468, § 23 (12 O.S.Supp.2003, § 2012). The amendment does not impact our disposition here.

legally cognizable claim *unless* the allegations indicate *beyond any doubt* that the litigant can prove *no* set of facts which would entitle him to relief." *Frazier v. Bryan Memorial Hospital Authority,* 775 P.2d 281, 287 (Okla.1989) (emphasis in original).

*Hayes,* 905 P.2d at 780.

▇▇▇ ¶ 5 We also keep in mind when reviewing this matter, the primary goal of statutory interpretation is to ascertain and follow the Legislature's intention. *See Fulsom,* 2003 OK 96, at ¶ 7, 81 P.3d at 655; *see also TRW/Reda Pump v. Brewington,* 1992 OK 31, 829 P.2d 15, 20. "[T]he plain meaning of a statute's language is conclusive except in the rare case when literal construction produces a result demonstrably at odds with legislative intent." *Samman,* 2001 OK 71, at ¶ 13, 33 P.3d at 307, relying on *City of Tulsa v. Public Employees Relations Board,* 1998 OK 92, ¶ 14, 967 P.2d 1214, 1220. A court is duty-bound to give effect to legislative acts, not amend, repeal or circumvent them. *City of Tulsa,* 1998 OK 92, at ¶ 18, 967 P.2d at 1221. When a court is called on to interpret a statute, the court has no authority to rewrite the enactment merely because it does not comport with the court's view of prudent public policy. *See id.* Also, the wisdom of choices made within the Legislature's law-making sphere are not our concern, because those choices—absent constitutional or other recognized infirmity—rightly lie within the legislative domain. *See Fulsom,* 2003 OK 96, at ¶ 14, 81 P.3d at 658.

▇▇▇ ¶ 6 It is also the settled rule when a court is construing seemingly conflicting statutes that a specific statute controls over one of more general applicability and the most recent enactment controls over an earlier one. *Milton v. Hayes,* 1989 OK 12, 770 P.2d 14, 15. It is further understood that only when two statutory provisions irreconcilably conflict will an implied repeal of the earlier or more general provision be found. *City of Sand Springs v. Department of Public Welfare,* 1980 OK 36, 608 P.2d 1139, 1151. Finally, the more recent and specific statute will be determined to modify or supercede an earlier, more general statute only to the extent necessary to avoid the irreconcilable conflict or inconsistency. *Id.; see also Upton v. State ex. rel. Department of Corrections,* 2000 OK 46, ¶ 11–13, 9 P.3d 84, 88.

## PART II.   FACTUAL AND PROCEDURAL BACKGROUND.

¶ 7 We set forth pertinent factual allegations, or reasonable inferences from them, contained in plaintiff's trial court petition, as we must take same as true in reviewing the trial court's dismissal.[3] In 1983 plaintiff was injured while working for O G & E Energy Corporation.[4] He was determined to be permanently and totally disabled by order of the WCC in 1991 and began receiving PTD benefits. In September 1999 he became an inmate of DOC.[5] In 2000 plaintiff learned that all, i.e., 100%, of his PTD benefits were being deposited to DOC's clearing account for transfer to its "revolving fund" for costs of his incarceration.[6]

---

3. Only factual allegations, or reasonable inferences therefrom, deemed necessary to resolve this case or place the legal question(s) before us in proper perspective are set forth. Plaintiff's petition also contains legal conclusions. We discuss them only as needed to frame the issue(s).

4. The exact nature of plaintiff's injury is not delineated in the record presented on appeal.

5. When plaintiff filed suit in the trial court in 2002 he was imprisoned at a private correctional facility in Watonga, Oklahoma. Neither the term of his imprisonment nor the crime for which he was convicted are revealed by the appeal record.

6. Plaintiff's trial court petition refers to 57 O.S. § 541 a statute concerning the DOC Industries Revolving Fund, a fund maintained in the State

Treasury. See 57 O.S.Supp.2003, § 541. A different fund, called simply the DOC Revolving Fund, consists of monies from several sources and expenditures from it are to be used for general operating expenses of DOC. 57 O.S.2001, § 557. In our view, the revolving fund that is the ultimate repository for plaintiff's workers' compensation permanent total disability (PTD) benefits is the § 557 DOC Revolving Fund, not the § 541 Industries Revolving Fund mentioned in plaintiff's petition. Title 57 O.S.2001, § 549(C) provides:

The [DOC] may assess costs of incarceration against all inmates beginning on September 1, 1992. Such costs shall be a debt of the inmate owed to the [DOC] and may be collected as provided by law for collection of any other civil debt. In addition to the provisions of this section authorizing expenditure of inmate trust

¶ 8 Via his lawsuit plaintiff asserted § 549(B)(1) allowed DOC to retain no more than 50% of his workers' compensation benefits for costs of incarceration. He sought an accounting from DOC concerning the PTD benefits it had received and retained, recovery of the amount he claimed had been overcharged (i.e., in effect, anything over 50% of the PTD benefits paid since his incarceration in September 1999) and injunctive relief to prohibit DOC from future retention of more than 50% of any PTD benefits paid during his incarceration.[7] He also attacked DOC OP 120230(I)(B)(5)(b), a DOC rule or operating policy, that allows DOC to retain all of an inmate's PTD benefits for costs of incarceration, as being inconsistent with his interpretation of § 22(13)(b) and § 549(B)(1), which he asserted could be harmonized in regard to PTD benefits.[8] In effect, plaintiff argued in the trial court that the language contained in § 22(13)(b) was only intended as a procedural device by which the PTD benefits were to be directed to his inmate account, rather than as a mandate as to the ultimate disposition of those benefits. He asserted the controlling statute as to DOC's authority on retention of the PTD benefits for costs of incarceration was, instead, § 549(B)(1), which allows DOC to charge not more than 50% of amounts from an inmate's prison employment or other income, including workers' compensation benefits, received on behalf of an inmate and deposited to his/her DOC-maintained inmate account.

¶ 9 Defendants moved for dismissal, in essence, positing the two statutory provisions were irreconcilably inconsistent as to PTD benefits and that § 22(13)(b) controlled. The trial court agreed with defendants and dismissed for failure to state a claim upon which relief could be granted. The trial court de-

cided plaintiff would be unable to amend his petition to state a claim because, in effect, the matter revolved around a legal question and the answer to the question, that § 22(13)(b) allowed distribution to and retention by DOC of all the PTD benefits paid during his incarceration, required dismissal of the suit. The COCA affirmed and, as noted, we previously granted certiorari review.

¶ 10 On certiorari plaintiff asserts to interpret the two statutes as the trial court and COCA have done, constitutes an improper diminishment of his vested PTD benefit. He also questions the public policy considerations of treating him, a totally disabled inmate differently from a healthy inmate, who is able to work while incarcerated and to have no more than 50% of his/her income from prison employment taken for costs of incarceration. Plaintiff asserts that the disabled inmate, who cannot work because of the disability, is disadvantaged and will leave prison with no money to re-establish himself/herself in society, while the healthy inmate, who has worked while imprisoned in some type of prison employment, will upon discharge have, at least, some available funds in his/her inmate account(s) to start life anew outside the prison walls.

## PART III.  ANALYSIS.

■ ¶ 11 In June 1993 the Legislature added § 22(13)(b) to our workers' compensation statutes, to be effective September 1, 1993. 1993 Okla. Sess. Laws, Ch. 349, § 10. Though § 22 has been amended several times since the addition, § 22(13)(b) has remained unaltered. It provides:

Any employee convicted of a misdemeanor or felony and sentenced to a term of incarceration of at least ninety (90) days in this state **shall have all benefits for**

funds for costs of incarceration, any monies received for costs of incarceration shall be deposited in the [DOC] Revolving Fund.
Given the language of the last sentence of § 549(C), it appears to us unmistakable the PTD benefit money retained by DOC for costs of incarceration is to be ultimately deposited to the DOC Revolving Fund delineated in § 557.

7. Throughout this litigation, i.e., from filing his trial court petition thru the filing of his certiorari petition on December 30, 2002, plaintiff, in effect, admits or concedes DOC is allowed to retain

50% of his PTD benefits for costs of incarceration under § 549(B)(1)'s language. We also note that plaintiff does not allege or contend in his trial court petition or in any other document we have been provided in this matter that the amount of his PTD benefit received or to be received during his incarceration exceeds the amount of the costs of his incarceration.

8. Plaintiff's trial court petition, part of the appeal record, has a copy of DOC OP 120230(I)(B)(5)(b) attached to it.

**permanent total disability** or temporary partial disability awarded by the Workers' Compensation Court and **paid during the period of incarceration deposited to the credit of an account established pursuant to Section 549 of Title 57 of the Oklahoma Statutes for distribution in full to the Department of Corrections for costs of incarceration.** The State Board of Corrections shall have the power to collect workers' compensation benefits on behalf of the prisoner as provided in this subparagraph and to distribute the benefits as provided by law.

(emphasis added).[9]   In conformity with § 22(13)(b)   DOC   promulgated   OP 120230(I)(B)(5)(b).  It provides:

All Oklahoma awarded workers' compensation benefits received for permanent total disability or temporary partial disability by an inmate with an incarceration sentence of at least 90 days will be deposited to the department's clearing account for transfer to the revolving fund.  (85 O.S. Section 22, Paragraph 13)[10]

**9.** 85 O.S.2001, § 22(13)(a) was also added to § 22 in 1993 and it provides:

Any employee convicted of a misdemeanor or felony and sentenced to a term of incarceration of at least ninety (90) days in this state or in any other jurisdiction shall have all benefits for temporary total disability awarded by the Workers' Compensation Court forfeited by order of the Court on motion of the employer or the employer's insurer after confirmation of the employee's incarceration. The Court also may order the forfeiture of such benefits on its own motion upon receipt of notice from the Director of [DOC] that the person awarded the benefits is incarcerated as an inmate in a facility operated by or under contract with [DOC]. The provisions of this subparagraph shall not apply to any benefits awarded to an inmate for compensable injuries sustained by the inmate while in the employ of a private for-profit employer or while employed in private prison industries, involving a for-profit employer, which deal in interstate commerce or which sell products or services to the federal government.

**10.** No issue concerning retention by DOC of workers' compensation temporary partial disability benefits is before us in this case.

**11.** On April 27, 2004 the Governor of Oklahoma signed into law Senate Bill No. 1397 (passed by the Legislature) which amends § 549(B)(1) and the content of § 549(B)(2), moves former

At the time § 22(13)(b) was added in 1993, § 549(B)(1) provided:

B.  The State Board of Corrections shall cause to be placed in an account income from the inmate's employment and any other income or benefits accruing to or payable to and for the benefit of said inmate, **including any workers' compensation** or Social Security benefits.

1.  From this account the State Board of Corrections **may   charge** any inmate [working] in private prison industries or **any** other **inmate for costs of incarceration not to exceed fifty percent (50%) of any deposits made to said account.**

1992 Okla. Sess. Laws, Ch. 319, § 5; 57 O.S.Supp.1992,   § 549(B)(1)(emphasis added).[11]

¶ 12 Subsection 22(13)(b) plainly expresses, in clear and unambiguous language, an intention that inmates in plaintiff's situation "**shall have all benefits for [PTD] ... paid during the period of incarceration deposited to the credit of an account established pursuant to [§] 549 ... for distribution in full to [DOC] for costs of incarceration.**" (empha-

§ 549(B)(2)   to   § 549(B)(3)   and   former § 549(B)(3) to a new numbered § 549(B)(4). The amendments to § 549 are found in § 9 of Senate Bill No. 1397. The amended version of § 549(B)(1)-(2), with underlining showing additions, follows:

B.  The State Board of Corrections shall cause to be placed in an account income from the inmate's employment and any other income or benefits accruing to or payable to and for the benefit of said inmate, including any workers' compensation or Social Security benefits.

1.  From this account the State Board of Corrections may charge <u>for costs of incarceration</u> any inmate [working] in private prison industries or any other inmate for costs of incarceration not to exceed fifty percent (50%) of any deposits made to said account, *unless said* <u>de-</u><u>posits were from a workers' compensation</u> <u>benefit.</u>

2.  <u>From this account, the State Board of Corrections may charge any inmate for costs of incarceration, an amount equivalent to one hundred percent (100%) of any deposits from a workers compensation benefit to said account.</u>

The only other amendment made to § 549(B)(1) since 1992 was one made by the Legislature in 1996 with substitution of the word "working" for the word "employed". We have noted this change in the quotes in the text and this footnote by brackets. 1996 Okla. Sess. Laws, Ch.166, § 2.

sis added). The provision is written in mandatory language and, we believe may only be read in one way, that is that DOC is entitled to 100% of the PTD benefit paid during the prisoner's incarceration for the costs of that prisoner's incarceration. DOC OP 120230(I)(B)(5)(b) conforms to and is consistent with the statutory language and its plainly expressed legislative intent.

¶ 13 In contradistinction to § 22(13)(b), § 549(B)(1), also in plain and unambiguous language, permissively allows DOC to charge inmates, for costs of incarceration, no more than 50% of income from an inmate's employment and other income, including workers' compensation benefits, placed in the inmate's account. The two provisions are in absolute tension with each other and they irreconcilably conflict as concerns workers' compensation PTD benefits. One must prevail and that one is § 22(13)(b) in so far as PTD benefits are concerned. This is so because said provision expresses the most recent legislative intent as to PTD benefits and § 22(13)(b) specifically addresses those benefits, while § 549(B)(1) is more generally concerned with inmate income of all kinds.

¶ 14 For us to rule in favor of plaintiff's position would entail rewriting the language of § 22(13)(b), something we have no warrant in undertaking. If the Legislature seeks to limit DOC's entitlement, for costs of incarceration, to less than 100% of a PTD benefit being paid to an inmate by virtue of a workers' compensation order during the period of that inmate's imprisonment, it is that body which must express such an intent. To date, the Legislature has not done so and it is not within the realm of this Court's power, under the guise of statutory interpretation or construction, to do what the Legislature has failed to express in its legislation.

¶ 15 Plaintiff's argument, to the effect, that to interpret the two statutory provisions to allow DOC to retain 100% of the

PTD benefits paid during his incarceration is an impermissible diminishment of his vested workers' compensation PTD benefit, is mistaken. In *Valenti v. Special Indemnity Fund,* 2000 OK CIV APP 81, 8 P.3d 197, the COCA, Div. III (same division as in this case) correctly recognized that § 22(13)(b) does not diminish, i.e., alter the amount of, the PTD award. *Valenti,* 2000 OK CIV APP 81, at ¶ 8, 8 P.3d at 199. Instead, § 22(13)(b) merely redirects the PTD benefit to pay a debt to the inmate's custodian, DOC (in essence, the State of Oklahoma), the entity responsible for the inmate's care and custody *during the period of imprisonment.* As such, § 22(13)(b) cannot be considered a substantive change in plaintiff's vested right to PTD benefits. After his incarceration has ended, the PTD benefits, assuming he is still entitled to them under any pertinent and valid WCC order, will no longer be so redirected.[12]

¶ 16 The plaintiff also argues in his certiorari petition that interpreting § 22(13)(b) to allow retention by DOC of 100% of his PTD benefits violates public policy. He asserts such an interpretation sanctions treating disabled inmates—who are unable to work at any job while imprisoned because of their disability and, thus, earn any "wages"—worse than healthy inmates—who are able to work and earn income while imprisoned, but who do not have all of said income taken for costs of incarceration. He also asserts the inmate who works while incarcerated has, under § 549(A)(5), twenty percent (20%) of any inmate "wages" earned during imprisonment placed in an account for the inmate, payable to him/her upon discharge, while the totally disabled inmate has *no opportunity* to work and earn any "wages" in prison employment, a part of which could be set aside for said inmate upon discharge. Plaintiff contends the heathy inmate will, thus, leave prison with at least some money to start life anew, while the totally disabled inmate will leave prison with no funds to reestablish himself/herself in society.

12. As we set out at *supra* note 6, pursuant to 57 O.S.2001, § 549(C), the costs of incarceration are a debt of the inmate owed to DOC. We also note that we do not have before us in this case any question as to priority between DOC and another entity or person other than plaintiff to

the monies being paid to plaintiff for PTD benefits. For example, this case does not decide who would have priority to PTD benefit monies, or some part of it, in a situation pitting DOC's entitlement thereto with that of a former spouse based on a valid lien for child support.

¶ 17 Plaintiff's public policy argument suffers from, at least, two flaws. One, absent constitutional or other recognized infirmity, it is the Legislature that sets the public policy of this State, not this Court, as to the direction of workers' compensation benefits of prison inmates during their confinement. Two, as we noted in ¶ 15 above, the totally disabled inmate will have a source of income upon discharge by virtue of his disability, assuming the PTD benefit is still in force under any pertinent and valid WCC order. Finally, we note, plaintiff has cited no controlling authority that the legislative public policy choices made in this area are constitutionally or otherwise infirm, such that this Court has the rightful authority to strike down those choices.[13]

**PART IV. CONCLUSION.**

¶ 18 This case concerns a first impression question, to wit: does § 85 O.S.2001, § 22(13)(b) or 57 O.S.2001, § 549(B)(1) control the ultimate fate of workers' compensation permanent total disability benefits paid to plaintiff during his incarceration under the control and in the custody of DOC? In that these two statutory provisions, in relation to the PTD benefits being paid to plaintiff during his imprisonment, are irreconcilably in conflict, § 22(13)(b) controls, as it is both the more specific statute as to such benefits and

the most recent expression of the legislative will. Therefore, the trial court correctly granted defendants' motion to dismiss for plaintiff's failure to state a claim upon which relief could be granted and the COCA did not err in affirming the trial court's dismissal.

¶ 19 The opinion of the Court of Civil Appeals is **VACATED** and the trial court Order Granting Defendants' Motion to Dismiss is **AFFIRMED.**

¶ 20 WATT, C.J., HODGES, LAVENDER, HARGRAVE, WINCHESTER and EDMONDSON, JJ., concur.

¶ 21 OPALA, V.C.J., KAUGER and BOUDREAU, JJ., dissent.

OPALA, V.C.J., with whom KAUGER and BOUDREAU, JJ., join, dissenting.

¶ 1 The court vacates today the Court of Civil Appeals' opinion and affirms the trial court's dismissal order, *declaring* (a) that **two statutes** dealing with the State's right to compensation benefits of **incarcerated convicts**—one enacted earlier which authorizes seizure of only fifty percent of one's compensation award[1] and the later of the entire award[2]—are not *in pari materia* on the subject of an incarcerated convict's right to

---

**13.** We also note that nothing in our decision in this case conflicts with our previous decisions in *Cumbey v. State,* 1985 OK 36, 699 P.2d 1094, *cert. denied,* 474 U.S. 838, 106 S.Ct. 115, 88 L.Ed.2d 94 (1985) and *Webb v. Maynard,* 1995 OK 125, 907 P.2d 1055, *cert. denied,* 517 U.S. 1143, 116 S.Ct. 1436, 134 L.Ed.2d 557 (1996). *Cumbey* concerned inmate income from prison labor and work release programs. There held, in part, as such income was considered a gratuity serving certain penological objectives and was not actually wages as thought of in a traditional employer-employee relationship, prison inmates were not deprived of any vested property interest to which they were entitled regarding the income by statutory provisions 1) requiring a certain percentage of it to be placed in a mandatory savings account to be released to the inmate upon his discharge from prison or 2) withholding not in excess of 50% of income from certain prison labor to pay for the costs of incarceration. Nothing in *Cumbey* is inconsistent with a determination 85 O.S.2001, § 22(13)(b) authorizes DOC to retain, for costs of incarceration, all PTD benefits paid to an inmate during incarceration or that § 22(13)(b) controls over the conflicting terms of § 549(B)(1). In *Webb*

we held DOC was authorized by 57 O.S.Supp. 1993, § 549(A)(4)-(5) and § 549(B)(2) to withdraw a portion of an inmate's prison "wages" to apply toward court costs and victim compensation fees that had been imposed upon him in the criminal case that had led to his imprisonment.

**1.** The terms of 57 O.S.2001 § 549(B)(1) are:

B. The State Board of Corrections shall cause to be placed in an account income from the inmate's employment and any other income or benefits accruing to or payable to and for the benefit of said inmate, including any workers' compensation or Social Security benefits.
1. From this account the State Board of Corrections may charge any inmate working in private prison industries or any other inmate for costs of incarceration **not to exceed fifty percent (50%) of any deposits made to said account.**
(emphasis added).

**2.** The pertinent terms of 85 O.S.2001 § 22(13)(b) are:

(b) Any employee convicted of a misdemeanor or felony and sentenced to a term of incarcera-

receive adjudged compensation benefits for permanent total disability and (b) that the later-enacted statute, being the most recent expression of legislative will, supersedes the earlier version. Because the court's pronouncement fails to reach the dispositive issues in this public-law controversy,[3] I recede from its opinion.

¶ 2 In this controversy the court is not only entirely free, but also bears **the duty, to make its own formulation of the questions that must be resolved.**[4] Two issues, both having a constitutional dimension, appear **absolutely necessary for today's pronouncement. The first is** whether the statutory extrajudicial forfeiture of a prisoner's compensation benefits (for the cost of incarceration) with no duty to account for the **actual cost of the prisoner's institutional mainte-**

> tion of at least ninety (90) days in this state shall **have all benefits for permanent total disability or temporary partial disability** awarded by the Workers' Compensation Court and paid during the period of incarceration **deposited to the credit of an account** established pursuant to Section 549 of Title 57 of the Oklahoma Statutes **for distribution in full to the Department of Corrections for costs of incarceration.....**
> (emphasis added).

3.  The distinction between public and private law is well recognized in the Anglo–American legal system. Blackstone acknowledged the distinctness of these two bodies of law. BLACKSTONE'S COMMENTARIES ON THE LAWS OF ENGLAND, Vol. III, p. 1 [private wrongs], Vol. IV, p. 1 [public wrongs] (Wendell's ed. 1859). He defined a private wrong as an infringement or privation of the private or civil rights belonging to individuals, considered merely as individuals, and therefore termed civil injuries, while public wrongs were described as a breach and violation of public rights and duties affecting the entire community, considered as a community. Notwithstanding Blackstone's late eighteenth-century teachings, the term "public law" is not commonly used in the United States. Cappalli, THE AMERICAN COMMON LAW METHOD (1997), pg. 177.

4.  This court is never chained to the exact theory on which the case was presented to the trial court when it is resolving purely public-law issues. *Davis v. B.F. Goodrich*, 1992 OK 14, ¶ 3, 826 P.2d 587, 593–94 (Opala, J., concurring)(citing *Reynolds v. Special Indemn. Fund*, 1986 OK 64, ¶ 14, 725 P.2d 1265, 1270); *Burdick v. Independent School Dist. No. 52 of Oklahoma County*, 1985 OK 49, ¶ 10, 702 P.2d 48, 54; *McCracken v. City of Lawton* 1982 OK 63, ¶ 9, 648 P.2d 18, 21. n. 11.

nance constitutes a **"bill of attainder"** prohibited by Art. 2 § 15, Okl. Const.[5] **The other is** whether an award's forfeiture offends the Oklahoma constitutional interdiction against **"forfeiture of estate"** as an incident of conviction.[6] Neither is addressed by today's pronouncement.[7]

## I

## DOES THE STATUTORY EXTRAJUDICIAL FORFEITURE OF A PRISONER'S COMPENSATION BENEFITS (FOR THE EXPENSE OF INCARCERATION) WITH NO DUTY TO ACCOUNT FOR THE ACTUAL COST OF THAT PRISONER'S UPKEEP CONSTITUTE A BILL OF ATTAINDER PROHIBITED BY THE TERMS OF ART. 2 § 15, OKL. CONST.?

5.  The terms of Art. 2 § 15, Okl. Const., are:

    > **No bill of attainder,** ex post facto law, nor any law impairing the obligation of contracts, **shall ever be passed. No conviction shall work** a corruption of blood or **forfeiture of estate:** Provided, that this provision shall not prohibit the imposition of pecuniary penalties.
    (emphasis supplied).
    The U.S. Constitution's counterpart targets not only the Congress but also state legislatures. Art. 1 § 10, cl. 1, U.S. Const. Its terms are:
    > **No State shall** enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; **pass any Bill of Attainder,** ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility.
    (emphasis supplied).
    The federal equivalent of this State's prohibition against bills of attainder appears in Art. 1 § 9, cl. 3, U.S. Const. Its terms are:
    > No Bill of Attainder or ex post facto Law shall be passed.

6.  For the constitutional interdiction of forfeiture of estate, see the pertinent terms of Art. 2 § 15, Okl. Const., *supra* note 5.

7.  The prisoner challenged, on other grounds, the Department of Correction's right to retain, for the costs of incarceration, the full amount of his compensation benefits for permanent total disability. For a discussion of the various challenges to prison reimbursement legislation, see George L. Blum, *Validity, Construction, and Application of State Statute Requiring Inmate to Reimburse Government for Expense of Incarceration*, 13 ALR5th 872 (1993).

¶ 3 A bill of attainder [8] is a legislative act that inflicts punishment **without a judicial trial**.[9] If the legislatively inflicted punishment be less than death, the enactment is termed a bill of pains and penalties.[10] The provisions of this State's constitution, Art. 2 § 15,[11] which prohibit the legislature from passing a bill of attainder,[12] encompass within their terms a like proscription of bills of pains and penalties. In the attainder context "punishment" means more than imprisonment, fine or a death sentence.[13] It compre-

hends "a legislative decree of perpetual exclusion from a chosen vocation" **or from some other government-conferred advantage.** Most surely, attainder also includes an act which legislatively wills the loss of law-prescribed benefits from an on-the-job injury [14]—the loss to be addressed in this case.

8. Bills of attainder were commonly used against political groups the English Parliament found treasonous. Parliament **adjudicated** activities deemed treasonous and **punished** them by death. The framers of the United States Constitution—to whom a bill of attainder doubtless meant an act of the legislature that sentenced a person to death and prevented his heirs from inheriting property—deemed the interdiction of bills of attainder to be a necessary constitutional guard against legislative encroachment on the judiciary, **federal and state.** Jane Welsh, *The Bill of Attainder Clause: An Unqualified Guarantee of Process*, 50 Brook. L.Rev. 77, 83–85 (1983). In the twentieth century, the U.S. Supreme Court extended the prohibition (against bills of attainder) to all legislative acts that punish, without a trial, either named individuals or easily ascertainable class members. *United States v. Lovett*, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946); see also *Welsh, supra* at 90–93 (discussing the Court's broadened interpretation of the Bill of Attainder Clause).

9. *Lovett, supra* note 8, 328 U.S. at 315, 66 S.Ct. at 1078, *citing Cummings v. State of Missouri*, 71 U.S. (4 Wall.) 277, 323, 18 L.Ed. 356 (1866). As a general rule, bills of attainder specifically identify persons or classes of persons who are to be deprived of a right as a kind of punishment. *Cummings, supra*, (a priest was barred from practising his profession); *Ex parte Garland*, 71 U.S. (4 Wall.) 333, 18 L.Ed. 366 (1866) (a lawyer was barred from federal-court practice); *Lovett, supra* note 8, 328 U.S. at 316, 66 S.Ct. at 1079 (the Court struck down a legislative determination of guilt that resulted in the loss of wages); *United States v. Brown*, 381 U.S. 437, 443, 85 S.Ct. 1707, 1715, 14 L.Ed.2d 484 (1965) (the Court struck down an act that focused upon easily identifiable members of a class (the Communist Party) and imposed on them the sanction of mandatory forfeiture of a job or office). *See also* Oklahoma jurisprudence in *Golden v. Okfuskee County Election Bd.*, 1986 OK 57, ¶ 2, 723 P.2d 982, 983 (Opala, J., dissenting); *Haley v. Oklahoma Alcoholic Beverage Control Board*, 1984 OK CIV APP 58, ¶ 21, 696 P.2d 1046, 1050; *Oklahoma Alcoholic Beverage Control Board v. Seely*, 1980 OK 1989, ¶¶ 2–3, 621 P.2d 534, 538–39 (Opala, J., concurring in result).

10. *Cummings, supra* note 9, 71 U.S. at 323; *Welsh, supra* note 8 at 83–84. " 'Pains and penalties' historically consisted of a wide array of punishments: commonly included were imprisonment, banishment, and the punitive confiscation of property by the sovereign." *Nixon v. Administrator of General Services*, 433 U.S. 425, 474, 97 S.Ct. 2777, 2806, 53 L.Ed.2d 867 (1977) (citations omitted).

11. For the terms of Art. 2 § 15, Okl. Const., see *supra* note 5.

12. *State Mut. Life Assur. Co. of America v. Hampton*, 1985 OK 19, ¶ 2, n. 3, 696 P.2d 1027, 1035 n. 3 (Opala, J., concurring)

13. *See Flemming v. Nestor*, 363 U.S. 603, 628, 80 S.Ct. 1367, 1382, 4 L.Ed.2d 1435 (1960) (Douglas, J., dissenting) (a Bulgarian immigrant's social security benefits were forfeited because he had been a member of the communist party). The dissent by Douglas, J., quotes from *Irving Brant*, 363 U.S. at 629, 80 S.Ct. at 1382 ("Address entitled Bills of Attainder in 1787 and Today. Columbia Law Review dinner 1954, published in 1959 by the Emergency Civil Liberties Committee, under the title Congressional Investigations and Bills of Attainder"):

> 'Today's bill of attainder is broader than the classic form, and not so tall and sharp. There is mental in place of physical torture, and confiscation of tomorrow's bread and butter instead of yesterday's land and gold. What is perfectly clear is that hate, fear and prejudice play the same role today, in the destruction of human rights in America that they did in England when a frenzied mob of lords, judges, bishops and shoemakers turned the Titus Oates blacklist into a hangman's record. Hate, jealousy and spite continue to fill the legislative attainder lists just as they did in the Irish Parliament of ex-King James.'

14. *Lovett, supra* note 8, 328 U.S. at 315, 66 S.Ct. at 1079; *Brown, supra* note 9, 381 U.S. at 447, 85 S.Ct. at 1714; *Cooper v. Henslee*, 257 Ark. 963, 522 S.W.2d 391, 400 (1975)(Fogleman, J., concurring).

## II

## DOES FORFEITURE OF COMPENSATION BENEFITS OFFEND THE OKLAHOMA CONSTITUTIONAL INTERDICTION AGAINST "FORFEITURE OF ESTATE" AS AN INCIDENT OF CONVICTION?

¶ 4 **Forfeiture upon conviction of a felony or treason** was one of three kinds [15] of forfeitures recognized by English law at the time of ratification of the Bill of Rights. The institution then paraded under the verbal garb of "forfeiture of estate." All property, real and personal, of all those who stood convicted of a felony or treason was forfeitable to the Crown. This kind of forfeiture, grounded in punishment, was justified by the belief that property was a right derived from society which could be lost by a violator of society's laws.[16]

¶ 5 The framers of the U.S. Constitution [17] and members of the first Congress [18] rejected the use of English common-law forfeiture of estate as a criminal penalty in the United States. The terms of Art. 2 § 15, Okl. Const.,[19] explicitly abolish the common law that imposed a forfeiture of estate as an incident of felony conviction [20] but adds that the abolition does not include pecuniary fines.

¶ 6 By the terms of 85 O.S.2001 § 22(13)(b) [21] the State is authorized to **bring about an extrajudicial forfeiture of all compensation awarded** anyone convicted of a misdemeanor and, for example, sentenced to a 90–day jail term, to provide itself with reimbursement for the expense of incarceration. The State is given a carte blanche **to seize a prisoner's entire award—whether it be for $20,000 or $20—without any duty (a) to account** for the actual amount spent for the prisoner's 90–day prison upkeep **and (b) to disgorge** any excess funds seized in forfeiture above the actual incarceration costs.

¶ 7 Because the court's opinion declines to decide whether the forfeiture statute in contest is **facially violative** of the fundamental law's prohibition (a) against passage of bills of attainder and (b) against forfeitures of

---

**15.** The other two kinds are forfeitures (1) of *deodands* and (2) in statute-based proceedings. Of the three classes, only forfeitures in statute-based proceedings survive in the United States. The **ancient law of deodands** is founded on the fiction that an inanimate object (or an animal) may be guilty of wrongdoing. The value of an inanimate object (or an animal) causing the death of the King's subject was forfeitable to the Crown. *Austin v. United States*, 509 U.S. 602, 611, 113 S.Ct. 2801, 2806, 125 L.Ed.2d 488 (1993) (citing O. Holmes, THE COMMON LAW, c. 1 (1881), and *1 BLACKSTONE'S COMMENTARIES, supra* note 3 at 300–301). Of the most notable **statutory forfeitures** known to the English law were those which affected commodities and vessels used in violation of customs and revenue laws. *Calero–Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 682–83, 94 S.Ct. 2080, 2091–92, 40 L.Ed.2d 452 (1974); *Austin, supra*, 509 U.S. at 611–13, 113 S.Ct. at 2806–07. For an extended discussion of the three types of forfeiture recognized by the English law during the late eighteenth century, see *Austin, supra*, 509 U.S. at 611–16, 113 S.Ct. at 2806–09; *Calero–Toledo, supra*, 416 U.S. at 680–85, 94 S.Ct. at 2090–92. *See also State v. Bisaccia*, 45 N.J. 504, 213 A.2d 185, 187 (1965). For Oklahoma decisional law, see *State v. One 1965 Red Chevrolet Pickup*, 2001 OK 82, ¶ 14, 37 P.3d 815, 820–21.

**16.** *Austin, supra* note 15, 509 U.S. at 611–12, 113 S.Ct. at 2806–07 (citing 1 William *BLACKSTONE'S COMMENTARIES, supra* note 3 at 381–82 and *The Palmyra*, 25 U.S. (12 Wheat) 1, 14, 6 L.Ed. 531 (1827)); *One 1965 Red Chevrolet Pickup, supra,* note 15 at ¶ 14, at 820–21. For a brief discussion of instrumentalities of crime and their genesis in the law of forfeiture, see *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 303, 87 S.Ct. 1642, 1648, 18 L.Ed.2d 782 (1967); *Bisaccia, supra* note 15 at 187.

**17.** The terms of Art. 3 § 3, cl. 2 of the U.S. Constitution (the treason clause) expressly prohibit the use of English common-law criminal penalty of forfeiture for treason. In addition to the treason clause interdiction, the framers rejected the criminal penalty of forfeiture by prohibiting both the national and state governments from passing bills of attainder. Art. 1 § 9, cl. 3, and § 10, cl. 1, U.S. Const., *supra* note 5.

**18.** In drafting the earliest U.S. Punishment of Crimes Bill in 1790, the first Congress expressly rejected the use of forfeiture as a criminal penalty. *See* An Act for the Punishment of Certain Crimes Against the United States, 1st Cong., 2d Sess., Act of April 30, 1790 § 24 (prohibiting use of forfeiture as criminal penalty for any crime).

**19.** *Supra* note 5.

**20.** *Hampton, supra* note 12, at ¶ 2, at 1035 (Opala, J., concurring).

**21.** For the terms of 85 O.S.2001 § 22(13)(b), see *supra* note 2.

estate incident to one's conviction, I must recede from its pronouncement.